CHRIS DOBARD ET AL V. THE STATE OF TEXAS.

No. A-2675. Decided October 18, 1950.
(233 S. W., 2d Series, 435.)

*Taylor, Cox, Wagner & Adams,* of Brownsville, *Polk Hornaday,* of Harlingen, *D. C. Bland,* of Orange, and *L. Hamilton Lowe,* of Austin, for appellants.

The Act of the 51st Legislature (Article 934b-2, Vernon's Texas Penal Code) is unconstitutional in that it violates the provisions of Article 4, Section 2 of the Constitution of the United States which provides that citizens of each state shall be entitled to all privileges and immunities of citizens of the several states, and Article 14 section 1 of said constitution which provides that no state shall make or enforce any laws which shall abridge the privileges or immunities of the citizens of the United States. It also violates Article 1, section 3 of the Constitution of Texas which provides that no citizen of this state shall be deprived of property, privilege or immunity, except by due course of the law of the land. Neither is said act a conservation measure. McCready v. Virginia, 94 U. S. 391, 24 L. Ed. 248; Foster Fountain Packing Co. v. Haydel, 278 U. S. 1, 73 L. Ed. 147; Ex parte Baker, 127 Texas Crim. Rep. 589.

*Price Daniel,* Attorney General, *Jesse P. Luton, Jr.,* and *K. B. Watson,* Assistants Attorney General, for appellee.

Since appellants have not been injured by the enforcement of the Act in question, they are in no position to question its constitutionality. The provisions of said act do not violate either the State or Federal constitutions, since the State has the right to regulate commercial fishing within three marine leagues of its coast. Premier-Pabst Co. v. Grosscup, 298 U. S.

226; Texas Co. v. Stephens, 100 Texas 628, 103 S. W. 481; Galveston v. Mann, 135 Texas 319, 143 S. W. 2d 1028.

MR. JUSTICE GARWOOD delivered the opinion of the Court.

The appellants, Dobard et al., who are commercial shrimp fishermen and all but one nonresidents of Texas, were enjoined below at the behest of the State from pursuing their avocation (or other commercial fishing for edible sea life) in the salt waters of the State, including the marginal sea to a distance of three marine leagues from shore, without holding licenses for themselves and their boats as required by c. 68, Acts 51st Leg., Reg. Sess., Art. 934b-2, Vernon's Ann. Penal Code. Their appeal comes to us from the trial court under Rules of Civil Procedure, Rule 499-a and related provisions of law, the sole ground for reversal being that the abovementioned statute, upon which the injunction rests, is in conflict with both the state and federal constitutions.

The statute is our latest legislation purporting to regulate the business of fishing in the waters mentioned. It repealed a previous law (levying in effect an unequal license tax against nonresident commercial fishing in such waters) which we had sustained in Dodgen v. Depuglio, 146 Texas 538, 209 S. W. 2d 588. The Depuglio case rested largely on the three-judge court decision in Toomer v. Witsell, 73 Fed. Supp. 371, sustaining a somewhat similar statute of South Carolina, but that case was subsequently reversed in its pertinent part by the federal Supreme Court, which held the statute to violate the privileges and immunities clause (Art. 4, sec. 2) of the Federal Constitution. 334 U. S. 385, 92 L. Ed. 1460, 68 Sup. Ct. 1156. Still later, the very statute upheld by us was declared violative of the Federal Constitution by a three-judge court in Steed v. Dodgen, 85 Fed. Supp. 956, on the strength of the final decision in Toomer v. Witsell; these two cases being evidently the occasion for enactment of the substitute legislation now before us.

The present measure expressly describes itself as one of conservation. In substance it requires, under penalty of fine and imprisonment as well as injunction, that every person fishing for "edible aquatic life" in the abovementioned waters for hire or in order to sell his catch, shall have a license issued by the Game, Fish & Oyster Commission of the State and that every fishing boat used in such fishing shall also have such a license. Unlike the invalidated prior statute, it does not establish a differential type of license fee or tax, though it obviously does

favor residents in important respects over non-residents. Sections 4, 4a and 5 are copied in the margin.* Together with the brief provisions calling for licenses and forbidding fishing operations without licenses, the quoted sections reflect the entire scheme and all the standards to be followed to accomplish the declared purpose of the Act. It thus appears that: (a) the method used to conserve fish is to fix, that is to limit, the number of licenses for a given year, thus fixing or limiting the number of boats to be used and doubtless also the number of individuals to engage in the business; (b) in this latter connection (sec. 4) it is less than clear whether there are separate quotas to be set for boats and fishermen, when the quota for

---

*Sec. 4. In July of each year the Game, Fish and Oyster Commission of Texas shall set the quota of Commercial Fishing Boat Licenses to be issued the suceeding conservation year, which shall extend from September 1st of such year to August 31st of the succeeding year, after a survey and investigation and determination of the maximum poundage of shrimp, oysters and other edible aquatic life which may be caught during the following year commercially without danger to the maximum point of production; and when, in the opinion, finding and determination of the Commission, the maximum production has been reached so as to assure the ability to take a maximum crop for the following year, and the Commercial Fishing Boat Licenses and Commercial Fisherman's Licenses quotas for the current conservation year have been reached, then the Commission shall not issue any additional licenses except upon a public hearing after due notice to the public and persons interested under such rules and regulations as may be promulgated by the Commission. Within thirty (30) days after the effective date of this Act, the Commission shall determine the conservation quota for the period remaining until August 31, 1949, and shall issue licenses under such quota.

Sec. 4a. From and after the effective date of this Act all holders of present licenses shall be entitled to operate thereunder until September 1, 1949.

Sec. 5. After August 31, 1949, holders of prior licenses shall upon application made prior to September 1 of each year be entitled to a renewal thereof, and no new license shall be issued unless and until the holders of prior licenses who have applied for renewal licenses shall have been granted their licenses. Thereafter, new applicants who are resident citizens of Texas shall be given next priority in the order their applications were filed. In the event such applicant has not heretofore received for the current or prior year such license as applied for, or does not have the original or a duplicate thereof, such applicant shall make in writing, under oath, duly acknowledged in the State of Texas, an application addressed to the Game, Fish and Oyster Commission of Texas, giving in full detail information regarding the domicile, residence of the applicant, name, age, description, social security number, place of birth or naturalization; and if a resident of Texas, the date such residence was acquired and the place and state of former residence; whether or not the applicant has been convicted of violating the game and fish laws of the State of Texas, or of any other state or nation, and if so, the number, dates and places where convictions were had; and such other information as the Game, Fish and Oyster Commission of Texas shall require in order to determine the proper license and the rights of the applicant to receive or be denied such licesse or permit.

The failure of any applicant to give all of the information required herein shall constitute grounds for the refusal of such permit, and it shall be mandatory upon the Commission to refuse such permit. The making of any false statement shall constitute a felony, the crime of perjury punishable under the penal laws of this state, and shall be grounds for cancellation of any license issued under and by virtue of such application.

the latter, if any, is to be set, and upon what basis or standard such quota is to be determined, assuming, as we evidently should assume from the first part of sec. 4, that the intended basis of the *boat* quota is the estimated total amount of fish available during the ensuing September-September year; (c) the word "license" as used in the Act generally becomes ambiguous in various instances on account of the failure to specify whether it refers to one kind of license or another; (d) no distinction is drawn in the case of either boat or fisherman's license or the corresponding quotas between the various types of "edible aquatic life", which we judicially know to be objects of commercial fishing in the waters in question, so that, for example, if the boat quota were established on the basis of available shrimp it would yet also apply to boats used for taking other fish, whatever might be the abundance or scarcity of the latter as compared to shrimp; (e) the quota (or quotas) is to be determined annually prior to September 1, and the licenses issued annually for the year beginning with that date; but (f) holders of "licenses" for an expiring year have (sec. 5) a right of renewal, to the exclusion of new applicants, which right is thus not only preferential but also absolute in the sense that a license is entitled to a renewal for the following year regardless of the estimated scarcity or abundance of fish available for the renewal year; the result being that, while the actual number of boats (or fishermen) for a quota-year may theoretically be increased by increasing the quota over that of the prior quota-year, such number cannot be correspondingly decreased by a quota decrease, because the new quota cannot be less than the number of renewal applications made for the corresponding year; (g) if, after the renewal applications are granted, there should yet remain other licenses available within the new quota, new applicants who are "resident citizens of Texas" are preferred over other persons in the award of these remaining licenses (sec. 5), and this evidently without regard to any other consideration, although there is a weak inference in the latter part of sec. 5 that the Commission may have discretion to refuse a license on grounds of personal unfitness, such as bad character, of the applicant; (h) under the last sentence of sec. 4 with sec. 4a, the operation of the Act is begun by granting to all holders of "present licenses" (evidently meaning licenses in existence on the effective date of the Act, April 6, 1949) new licenses for an interim, or less than full year, quota period ending August 31, 1949, so that persons holding licenses on April 6, 1949, would thus be the "prior" licensees to enjoy preference as such with respect to the new licenses to be issued shortly thereafter for the first quota-year of twelve months (be-

ginning September 1, 1949) and corresponding preference with respect to subsequent years so long as they should continue to seek renewals under sec. 5.

As before indicated, the appellants are boat-owning or boat-operating shrimp fishermen and, according to the agreed statement of facts upon which the appeal is submitted, the principal controversy apparently concerns their right to use their boats for catching shrimp, but the pleadings and decree speak in terms of edible aquatic life generally. Beyond the information that shrimp in the waters concerned are migratory, of two kinds and enjoying the brief life span of one year, the statement contains almost nothing in the way of relevant data concerning the degree of relationship of the law to conservation as applied to any kind of fish life.

It also appears directly or inferentially from the agreed statement that: On the effective date of the Act, April 6, 1949, there were outstanding about 1450 boat licenses, of which only 6, or less than one half of one per cent, were held by nonresidents (The appellants say these licenses were issued under Art. 934b-1, Vernon's Annotated Penal Code, which was held invalid in Steed v. Dodgen, supra, while the state says they were issued under still another statute, Art. 934a, which requires licensing of commercial fishermen and their boats without distinction between residents and nonresidents and has not been invalidated or repealed. The agreed statement ignores the point). About ten days after April 6, 1949, the Commission established the interim "quota" by more or less arbitrarily declaring it to consist of the 1450 licenses abovementioned and allowed such licenses to subsist, and such quota to serve, for the four-and-one-half-month period until September 1 following. On July 14 the Commission fixed the quota for the fourthcoming year starting September 1 at about 1550 boat licenses, which number "represented, as near as could be determined, a renewal of licenses for all existing vessels required to be licensed under this statute, plus a reasonable increase of approximately 75 to 100 boats to be added to the existing fishing fleet." Our only information as to what theory or evidence was the basis of this action is the statement that "the purpose of the conservative quota was to guard against overfishing, and the consequent damage of depletion to an extent that the numbers of desirable spieces might be reduced to a number incapable of perpetuating itself at the normal annual production levels." (Whether "desirable species" refers to species of shrimp or of fish in general does not appear). After thus fixing the quota for the coming year, the Commission proceeded to dispense the corresponding

licenses. In so doing it "gave priority" to such of the abovementioned 1450 pre-April 6, 1949 holders as applied before September 1, 1949, but evidently on the latter date there remained an undisclosed but substantial number of licenses available within the quota of 1550, and thereafter applications were received and licenses issued until, on September 8, the quota was filled. In issuing this remaining number of licenses between September 1 and September 8, the Commission apparently gave no preference to Texas residents either as such or as prior licensees, the result being that appellants "could have secured such a license, had they filed their application before the quota was filed, September 8, 1949." The appellants, however, did not file applications until after September 8 and were accordingly refused licenses. It may reasonably be inferred, though the record does not explicitly so state, that the great majority of the license holders filling the quota of 1550 consisted of persons, who were each both a resident citizen of Texas and a "prior" licensee under the above mentioned interim quota and under some earlier statute, either the existing Art. 934a or the voided Art. 934b-1. What, if anything, was done about individual licenses as distinguished from boat licenses does not appear, though, as before stated, both types are called for by the statute before us (934b-2) and 934a, while the former contains language indicating that the quota system is applicable to both types.

The part of appellants' attack based directly on discrimination against nonresidents seems to find support in Takahashi v. Fish and Game Commission, 334 U. S. 410, 92 L. Ed. 1478, 68 Sup. Ct. 1138, and in the Supreme Court opinion in Toomer v. Witsell, supra, though the latter dealt with a discrimatory license tax type of statute, while the California act held void in Takahashi case excluded altogether from commercial fishing alien residents of the United States ineligible for citizenship. The most forceful reply of the State to this contention is that appellants were not in fact injured by this feature of the statute and so cannot attack it, because, under the abovementioned terms of the agreed statement, no citizenship discrimination was practiced with respect to that portion of the September 1949-September 1950 quota which remained unfilled on September 1, 1949, and appellants would have received their boat licenses had they applied prior to September 8, 1949, when the quota became filled. See Texas Co. v. Stephens, 100 Tex. 628, 103 S. W. 481, 485, and cases and discussions in 16 C. J. S., secs. 76 et seq., 11 Am. Jur., Const. Law, secs. 11 et seq., 47 Harv. L. Rev. 677. But be this as it may, there is no doubt that appellants were refused licenses and therefore cannot operate

their boats so as to engage in the business of fishing for shrimp in the Texas marginal sea, because the state will not permit more than 1550 boats to have licenses and engage in such business. We therefore think appellants, both the one resident and the many non-residents, may properly question, as they do, whether this denial, via a quota system, of the right to use fishing boats for a livelihood is a reasonable exercise of the police power of the state as against the due process guaranties of the state and federal constitutions. They are injured just as a sportsman hunter would be injured, if the state by a license scheme permitted only a limited number of particular guns or dogs to be used in hunting within the state and that number had already been reached when he came to apply. Being thus barred from hunting during the license year (and under a prior license preference system possibly barred forever), in favor of those who, as it were, got to the ticket office ahead of him, surely he could with propriety ask whether such a regulation was a reasonable restriction of his liberty to hunt, even though he would have gotten a license had he managed to apply before the quota was filled.

The declared purpose of the law, conservation, is indeed a proper one, and as applied to the marginal sea, evidently recognized by the abovementioned decisions of the federal Supreme Court to be a state concern valid in the absence of congressional pre-emption of the same field. But, while conscious of the presumptions favoring the validity of legislative action and the care which courts must exercise not to confuse doubts of legislative wisdom with want of legislative power, we conclude that the serious restriction of individual liberty to earn a livelihood which the present law imposes, together with the remoteness of its connection with its declared object of conservation, render it inconsistent with due process under our state constitution, whatever be its effect under the federal constitution.

Plainly the law does not merely require a license or the payment of a corresponding fee for commercial fishing. Nor does it simply limit the amount of fish a given fisherman or boat may take or the seasons in which or other circumstances under which fish may be caught. What it does is in effect to limit the number of boat owners who may fish for a livelihood, whether residents or nonresidents of the state, just as if it should be established that only such number of petroleum producers may operate in the state as the Railroad Commission shall from time to time consider proper for an orderly production of oil. The effect of this, particularly in the light of the renewal rights of

the first group of licensees, is to "freeze" the fishing industry at its present membership and to exclude the appellants and the many others who may hereafter elect to fish for a living from even making an attempt at it, unless the Commission should determine in some future year that the available supply of fish has increased. The matter is not one of appellants being allowed to fish while observing certain restrictions but of being allowed to fish at all. If, for example, the estimated supply of fish for some future year should be the same as it now is, but a far greater number of people should desire to catch them in their own boats than at present, obviously many, whether residents or nonresidents, would find themselves absolutely barred from exercising what is otherwise their right. That, generally speaking, one resident citizen has the right and as much right as another, to fish in state waters is plain. And so far as the marginal sea is concerned, the position of the nonresident is no different, since, under Toomer v. Witsell and the Takahashi case, the appurtenant state is evidently no longer the "owner" of the fish. So the statute is undoubtedly a serious restriction of the liberty of many, including the appellants, and operates more severely than the usual types of law regulating the taking of game or fish.

The mere limitation of the number of boats can have only a remote connection with the total amount of fish life to be taken, just as a limitation of the number of guns in the state, without reference to the kind of gun or the amount of game to be killed per gun or otherwise, would have little relation to the amount of wild game to be killed or as a bare limitation of the number of oil drilling rigs in the state, without reference to the kind of rig or the number of wells to be drilled by each, would have at best a rather remote effect on the conservation of petroleum. Clearly there is a point at which the reduction of the number of boats would reduce the amount of fish taken, because obviously a single boat would not normally take as many as, say, ten boats of the same type operating under identical circumstances. But under anything approaching ordinary conditions it cannot be said with the least certainty that reduction or increase of the number of boats, especially without any provision as to the size or other characteristic of the boats, would reduce or increase the total number of shrimp taken, still less do so to a degree commensurate with proper conservation for a given period. On the other hand, assuming the truth of the "less boats, more fish, more boats, less fish" formula, its power to reduce the total catch is limited, as above suggested, by the inability of the Commission to deny licenses to "prior" licensees. If, for

example, the amount of available shrimp for the year beginning September 1952 should fall to one fourth the amount for the corresponding previous year, the same number, or in any case a not inferior number, of boats licenses for the more bountiful year would yet be entitled to renewal licenses to catch the small supply of the lean year and, according to the postulate of the law itself, would thus deplete the 1952 breeding stock and defeat the object of conservation, while boat owners, like appellants, who did not get within the quota, will not be able to fish at all.

And since the appellants are actually enjoined from taking any kind of "edible aquatic life", including shrimp, we think it proper to consider also their argument that the law is arbitrary in applying exactly the same supposed conservation measure indiscriminately to all kinds of fish. Particularly in the absence of legislative or other findings to the contrary, we may assume that, for example, the 1951-52 estimated "crop" of one kind of fish life might be small, while the corresponding crop of another kind would be unusually large. In such event, since there is only the one type of license, how is the Commission to determine the quota of licenses? If the quota is based on one kind of fish, many people might, for lack of a license, be excluded from catching other kinds without any sound reason. If it is based on the latter, then the number of boats might well be exessive as to the former, and as to these the declared conservation theory of an appropriate boat quota would be abandoned. If based on all kinds of fish together—an obviously difficult matter—it would almost certainly work against the declared method of conservation as to some species and work injustice to many excluded fishermen as to others.

Moreover, conceding for argument that the nonresident appellants cannot rest on the point of discrimination against them as such, it is yet proper in evaluating the relationship between the law and conservation to consider the provision giving preference to resident citizens. If allowed to stand, the statute and the action already taken under it are reasonably calculated to perpetuate in effect a monopoly of commercial fishing for the favored class. As stated, it is a fair inference from the record that the great majority of the present license holders are resirent citizens, and these, as "prior" licensees have an absolute right to renewal in future years, even though the amount of available fish may greatly decrease hereafter, while if the present quota is hereafter enlarged so as to take in new applicants, resident citizens will have preference there also. Unlike the statute in the Takahashi case, the law does not purport to effect

conservation by simply excluding a certain class of fishermen and thereby perhaps reducing the number of fish caught by reduction of the number of catchers. The residence or citizenship of applicants or prospective applicants for licenses has nothing to do with determining the size of the quota; these considerations coming into play only in the distribution of the licenses within the quota after the latter has been established as a result of the estimate of the number of available fish. Therefore, the declared conservation theory of the law has no connection with citizenship. The injection of citizenship preference in filling the quota accordingly demonstrates that at least one essential object of the law is to confer on citizens of Texas the supposed economic benefits of a monopoly of fishing in the Texas marginal sea. Certainly it is not pretended that an individual resident licensee would catch less fish than a nonresident licensee or vice versa. It is said that residents may logically be preferred in conservation measures with the idea that they are more likely to cooperate in the administration of the law. Assuming this latter proposition to be true in fact, the argument has yet little force in the instant case, since there is nothing in the law to suggest any substantial need of cooperation by license holders. A fisherman either gets within the quota and may fish as he pleases, or he doesn't and may not fish at all. The absolute right of renewal accorded prior licensees supports this view that the law is actually intended for local monopoly, if also intended for conservation, since, as stated above, it more or less arbitrarily prevents reducing the size of the license quotas to conform to actual reductions in the supply of fish and thus causes the conservation theory of the law not to operate at all on the present license holders, who are largely resident citizens. An essential object of the law being thus an improper one, as it evidently is in the light of what was said by the federal Supreme Court in the Takahashi case and Toomer v. Witsell, we may with less hesitation than otherwise declare the law unreasonable because of the more or less arbitrary means whereby it restricts the right of persons to earn a livelihood through fishing in the salt waters of the state.

As previously indicated, our view expressed in Dodgen v. Depuglio, supra, and cases there cited, that fish in the marginal sea are the property of the appurtinent state, is evidently not now the law. Nor in the Depuglio case did we have occasion to consider the validity of a statute like the present one as a matter of either state or federal constitutional law. Indeed, we have been cited to no decision involving closely similar legislation. Time-honored methods of conservation, such as that of "sea-

sons" for particular kinds of fish upheld in Shipman v. Dupre, 88 F. Supp. 482, E.D.S.C., are quite different from the system here in question. Cases like Smith v. Texas, 233 U. S. 630, 58 L. Ed. 1129, 34 Sup. Ct. 681, which voided a state statute limiting the occupation of railroad conductor to former brakemen, do, however, illustrate that the admitted power of the state to regulate an otherwise legitimate occupation or calling does not entail such broad legislative discretion in the means of regulation as to forbid judicial enquiry into their reasonableness as a matter of due process. In any event, the governing principles, though general, are well established, and must be applied by us according to our best judgment, where precedents based on closely analogous facts appear to be lacking. So proceeding, we have reached the conclusion heretofore indicated and accordingly order that the judgment of the district court be reversed and judgment here rendered dissolving the injunction granted below.

Opinion delivered October 18, 1950.

No motion for rehearing filed.