The EPISCOPAL DIOCESE OF FORT WORTH, et al, Petitioners,

v.

The EPISCOPAL CHURCH,
et al., Respondents.

No. 11–0265.

Supreme Court of Texas.

Argued Oct. 16, 2012.

Decided Aug. 30, 2013.

Rehearing Denied March 21, 2014.

Richard R. Hayslett, Dallas, TX, for Amicus Curiae Anglican Communion Institute, Inc.

Kelly J. Shackelford, Liberty Legal Institute, Plano, TX, for Amicus Curiae Liberty Institute.

David B. West, Cox Smith Matthews Incorporated, San Antonio, TX, Lloyd J. Lunceford, Taylor Porter Brooks & Phillips, L.L.P., Baton Rouge, LA, for Amicus Curiae Presbyterian Lay Committee.

Eprhaim Radner, Wycliffe College, Canada, CA, pro se.

J. Shelby Sharpe, Sharpe & Rector, Fort Worth, TX, Kendall M. Gray, Andrews Kurth LLP, Houston, TX, R. David Weaver, The Weaver Law Firm PC, Arlington, TX, Scott A. Brister, Andrews Kurth LLP, Austin, TX, for The Episcopal Diocese of Fort Worth.

Frank Gilstrap, Frank Hill, Hill & Gilstrap PC, Arlington, TX, for Local Episcopal Congregations.

Jonathan D.F. Nelson, Jonathan D. F. Nelson PC, Arlington, TX, Kathleen Wells, Taylor Olson Adkins Sralla & Elam LLP, Fort Worth, TX, Thomas S. Leatherbury, William D. Sims Jr., Vinson & Elkins LLP, Dallas, TX, for Local Episcopal Parties.

David Beers, Mary Kostel, Goodwin Proctor LLP, Washington, DC, Sandra Cockran Liser, Naman Howell Smith & Lee PLLC, Fort Worth, TX, for The Episcopal Church.

Justice JOHNSON delivered the opinion of the Court, in which Justice HECHT, Justice GREEN, and Justice GUZMAN joined, and in Parts I, II, III, and IV–A of which Chief Justice JEFFERSON joined.

This direct appeal involves the same principal issue we addressed in *Masterson v. Diocese of Northwest Texas,* 422 S.W.3d 594, 2013 WL 4608632 (Tex.2013): what methodology is to be used when Texas courts decide which faction is entitled to a religious organization's property following a split or schism? In *Masterson* we held that the methodology referred to as "neutral principles of law" must be used. But, in this case the trial court granted summary judgment on the basis of the "deference" or "identity" methodology, and the record does not warrant rendition of judgment to either party based on neutral principles of law.

We reverse and remand to the trial court for further proceedings.

## I. Background

The Episcopal Church (TEC) is a religious organization founded in 1789. It has three structural tiers. The first and highest is the General Convention. The General Convention consists of representatives from each diocese and most of TEC's bishops. It adopts and amends TEC's constitution and canons. The second tier is comprised of regional, geographically defined dioceses. Dioceses are governed by their own conventions. Each diocese's convention adopts and amends its own constitution and canons, but must accede to

TEC's constitution and canons. The third tier is comprised of local congregations. Local congregations are classified as parishes, missions, or congregations. In order to be accepted into union with TEC, missions and congregations must subscribe to and accede to the constitutions and canons of both TEC and the Diocese in which they are located.

In 1982 the Episcopal Diocese of Fort Worth (the Diocese or Fort Worth Diocese) was formed after the Episcopal Diocese of Dallas voted to divide into two parts. The Fort Worth Diocese was organized "pursuant to the Constitution and Canons of the Episcopal Church" and its convention adopted a constitution and canons. The Diocese's constitution provided that all property acquired for the Church and the Diocese "shall be vested in [the] Corporation of the Episcopal Diocese of Fort Worth." The canons of the Diocese provided that management of the affairs of the corporation "shall be conducted and administered by a Board of Trustees of five (5) elected members, all of whom are either Lay persons in good standing of a parish or mission in the Diocese, or members of the Clergy canonically resident in the Diocese." The Bishop of the Diocese was designated to serve as chair of the board of the corporation. After adopting its constitution and canons the Diocese was admitted into union with TEC at TEC's December 1982 General Convention.

In February 1983, the Fort Worth Diocese filed articles of incorporation for the Fort Worth Corporation. That same year the Dallas and Fort Worth Dioceses filed suit in Dallas County and obtained a judgment transferring part of the Dallas Diocese's real and personal property to the Fort Worth Diocese. The 1984 judgment vested legal title of the transferred property in the Fort Worth Corporation, except for certain assets for which the presiding Bishop of the Dallas Diocese and his successors in office had been designated as trustee. The judgment transferred the latter assets to the Bishop of the Fort Worth Diocese and his successor in office as trustee.

Doctrinal controversy arose within TEC, leading the Fort Worth Corporation to file amendments to its articles of incorporation in 2006 to, in part, remove all references to TEC. The corporate bylaws were similarly amended. The 2007 and 2008 conventions of the Fort Worth Diocese voted to withdraw from TEC, enter into membership with the Anglican Province of the Southern Cone, and adopt amendments to the Diocese's constitution removing references to TEC.[1]

TEC responded. It accepted the renunciation of Jack Iker, Bishop of the Fort Worth Diocese, and TEC's Presiding Bishop removed Iker from all positions of authority within TEC. In February 2009, TEC's Presiding Bishop convened a "special meeting of Convention" for members of the Fort Worth Diocese who remained loyal to TEC. Those present at the meeting elected Edwin Gulick as Provisional Bishop of the Diocese and Chair of the Board of Trustees for the Fort Worth Corporation. The 2009 Convention also voted to reverse the constitutional amendments adopted at the 2007 and 2008 Conventions and declared all relevant offices of the Diocese to be vacant. Bishop Gulick then appointed replacements to the offices declared vacant, including the offices of the Trustees of the Corporation. TEC recognized the persons elected at the 2009 Convention as the duly constituted leadership of the Diocese.

---

1. Three parishes in the Diocese did not agree with the actions and withdrew from the Diocese. The Fort Worth Corporation transferred property used by the withdrawing parishes to them.

TEC, Rev. C. Wallis Ohls, who succeeded Bishop Gulick as Provisional Bishop of the Episcopal Diocese of Fort Worth, and clergy and lay individuals loyal to TEC (collectively, TEC) filed suit against The Episcopal Diocese of Fort Worth, the Fort Worth Corporation, Bishop Iker, the 2006 trustees of the corporation, and former TEC members (collectively, the Diocese), seeking title to and possession of the property held in the name of the Diocese and the Fort Worth Corporation.[2] Both TEC and the Diocese moved for summary judgment. A significant disagreement between the parties was whether the "deference" (also sometimes referred to as the "identity") or "neutral principles of law" methodology should be applied to resolve the property issue. TEC contended that pursuant to this Court's decision in *Brown v. Clark*, 102 Tex. 323, 116 S.W. 360 (1909), the deference methodology has been applied in Texas for over a century and should continue to be applied. Under that methodology, it argued, TEC was entitled to summary judgment because it recognized Bishops Gulick and Ohls, the leaders elected at the 2009 convention, and the appointees of the Bishops as the true and continuing Episcopal Diocese. TEC also contended that even if the neutral principles methodology were applied, it would be entitled to summary judgment. The Diocese, on the other hand, contended that in *Brown* this Court effectively applied the neutral principles methodology without specifically calling it by that name, and

Texas courts have continued to substantively apply that methodology to resolve property issues arising when churches split. Under the neutral principles methodology, the Diocese argued, it was entitled to summary judgment affirming its right to the property. The Diocese also maintained that even if the deference methodology were applied, it would still be entitled to summary judgment.[3]

The trial court agreed with TEC that deference principles should apply, applied them, and granted summary judgment for TEC. The Diocese sought direct appeal to this Court and we noted probable jurisdiction. We had previously granted the petition for review in *Masterson*, and we heard oral arguments for both cases on the same day.

## II. Jurisdiction

 The Government Code provides that "[a]n appeal may be taken directly to the supreme court from an order of a trial court granting or denying an interlocutory or permanent injunction on the ground of the constitutionality of a statute of this state." TEX. GOV'T CODE § 22.001(c). The trial court granted summary judgment and issued injunctions ordering the defendants to surrender all Diocesan property and control of the Diocesan Corporation to the Episcopal Diocese of Fort Worth, and ordering the defendants to desist from holding themselves out as leaders of the Diocese. While the trial court order did not

---

**2.** The defendants sought mandamus in the court of appeals regarding whether the attorneys for TEC had authority to file suit on behalf of the Corporation and the Diocese. *See In re Salazar*, 315 S.W.3d 279 (Tex.App.-Fort Worth 2010, orig. proceeding). The court of appeals conditionally granted mandamus relief, holding they did not. *Id.* at 285–86.

**3.** The Diocese also asserts that we should dismiss certain tort claims TEC brought

against individual defendants. The Diocese moved for summary judgment to dismiss these claims and argues that if we conclude the trial court erred in determining who was entitled to the property at issue, we should render the judgment the trial court should have rendered and dismiss the tort claims. Because of our disposition of the issue regarding who is entitled to the property, we do not address those claims.

explicitly address the constitutionality of a statute, "[t]he effect of the trial court's order ... is what determines this Court's direct appeal jurisdiction." *Tex. Workers' Compensation Comm'n v. Garcia,* 817 S.W.2d 60, 61 (Tex.1991).

In its motion for summary judgment TEC argued, in part, that the actions of the Board of Trustees in amending the Fort Worth Corporation's articles of incorporation were void because the actions went beyond the authority of the corporation, which was created and existed as an entity subordinate to a Diocese of TEC. TEC argued that "[t]he secular act of incorporation does not alter the relationship between a hierarchical church and one of its subordinate units" and that finding otherwise "would risk First Amendment implications." The Diocese, on the other hand, argued that the case was governed by the Texas Non–Profit Corporation Act [4] and the Texas Uniform Unincorporated Nonprofit Association Act [5]; under those statutes a corporation may amend its articles of incorporation and bylaws; and TEC had no power to limit or disregard amendments to the Corporation's articles and bylaws.

In its summary judgment order the trial court cited cases it said recognized "that a local faction of a hierarchical church may not avoid the local church's obligations to the larger church by amending corporate documents or otherwise invoking nonprofit corporations law." The trial court substantively ruled that because the First Amendment to the United States Constitution deprived it of jurisdiction to apply Texas nonprofit corporation statutes, applying them to determine the parties' rights would violate Constitutional provisions. The court's injunction requiring defendants to surrender control of the Fort Worth Corporation to the Episcopal Diocese of Fort Worth was based on that determination. The effect of the trial court's order and injunction was a ruling that the Non–Profit Corporation Act would violate the First Amendment if it were applied in this case. Accordingly, we have jurisdiction to address the merits of the appeal.

## III. "Deference" and "Neutral Principles"

■ In *Masterson* we addressed the deference and neutral principles methodologies for deciding property issues when religious organizations split. 422 S.W.3d at 647. Without repeating that discussion in full, suffice it to say that generally courts applying the deference approach to church property disputes utilize neutral principles of law to determine where the religious organization has placed authority to make decisions about church property. *See Jones v. Wolf,* 443 U.S. 595, 603–04, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979). Once a court has made this determination, it defers to and enforces the decision of the religious authority if the dispute has been decided within that authority structure. *Id.* But courts applying the neutral principles methodology defer to religious entities' decisions on ecclesiastical and church polity issues such as who may be members of the entities and whether to remove a bishop or pastor, while they decide non-ecclesiastical issues such as property ownership and whether trusts exist based on the same neutral principles of secular law that apply to other entities. *See Serbian E. Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 708–09, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976). We concluded in *Masterson* that the neutral principles methodology was the substantive basis of our decision in

---

4. TEX.REV.CIV. STAT. arts. 1396–1.01 to 1396–11.02

5. TEX.REV.CIV STAT. art. 1396–70.01

*Brown v. Clark,* 102 Tex. 323, 116 S.W. 360 (1909), and that Texas courts should utilize that methodology in determining which faction of a religious organization is entitled to the property when the organization splits. 422 S.W.3d at 647. We also concluded that even though both the deference and neutral principles methodologies are constitutionally permissible, Texas courts should use only the neutral principles methodology in order to avoid confusion in deciding this type of controversy. *Id.*

## IV. Application

### A. Summary Judgment—Deference

Based on our decision in *Masterson,* we hold that the trial court erred by granting summary judgment to TEC on the basis of deference principles. 422 S.W.3d at 649.

### B. Summary Judgment— Neutral Principles

TEC asserts that application of neutral principles may violate free-exercise protections if, for example, the Diocese is permitted to void its commitments to church laws because the specific formalities of Texas law governing trusts were not followed or if they are applied retroactively. *See Jones,* 443 U.S. at 606, 99 S.Ct. 3020 (noting that the case did not "involve a claim that retroactive application of a neutral-principles approach infringes free exercise rights"). But TEC recognizes that whether application of the neutral principles approach is unconstitutional depends on how it is applied. *See id.* at 606, 99 S.Ct. 3020 ("It remains to be determined whether the Georgia neutral-principles analysis was constitutionally applied on the facts of this case."). Because neutral principles have yet to be applied in this case, we cannot determine the constitutionality of their application. Further, TEC does not argue that application of procedural matters such as summary judgment procedures and

burdens of proof are unconstitutional. Thus, we address the arguments of the parties regarding who is entitled to summary judgment pursuant to neutral principles and conclude that neither TEC nor the Diocese is. *See Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London,* 327 S.W.3d 118, 124 (Tex.2010) (noting that when both parties move for summary judgment and the trial court grants one motion and denies the other, appellate courts consider the summary-judgment evidence, determine all questions presented, and render the judgment the trial court should have rendered).

Under the neutral principles methodology, ownership of disputed property is to be determined by considering evidence such as deeds to the properties, terms of the local church charter (including articles of incorporation and bylaws, if any), and relevant provisions of governing documents of the general church. *E.g., Jones,* 443 U.S. at 602–03, 99 S.Ct. 3020; *see Presbyterian Church v. E. Heights,* 225 Ga. 259, 167 S.E.2d 658, 659–60 (1969). TEC points out that deeds to the properties involved were not part of the summary judgment record when the trial court ruled. Thus, TEC argues, if we do not sustain the summary judgment in its favor, we should remand the case so the trial court may consider the record on the basis of neutral principles and the four factors referenced in *Jones:* (1) governing documents of the general church, (2) governing documents of the local church entities, (3) deeds, and (4) state statutes governing church property. *See Jones,* 443 U.S. at 602–03, 99 S.Ct. 3020. We agree that the case must be remanded for further proceedings under neutral principles.

Although deeds to the numerous properties involved were not before the trial court when it granted summary judgment, the Diocese asserts that there is no dis-

pute about its holding title to and having control of the properties. But TEC disagrees with that position. And absent agreement or conclusive proof of title to the individual properties and the capacities in which the titles were taken, fact questions exist under neutral principles of law, at a minimum, about who holds title to each property and in what capacity.[6] Accordingly, we cannot render judgment on the basis of neutral principles.

## C. Remand

Because the trial court must apply neutral principles on remand, for its guidance we address certain arguments made by the parties relating to that methodology. *See Edinburg Hosp. Auth. v. Trevino,* 941 S.W.2d 76, 81 (Tex.1997) ("Although resolution of this issue is not essential to our disposition of this case, we address it to provide the trial court with guidance in the retrial. . . .").

We first note that on remand the trial court is not limited to considering only the four factors listed in *Jones.* As we said in *Masterson, Jones* did not purport to establish a federal common law of neutral principles to be applied in this type of case. 422 S.W.3d at 651. Rather, the elements listed in *Jones* are illustrative. If it were otherwise and courts were limited to applying some, but not all, of a state's neutral principles of law in resolving non-ecclesiastical questions, religious entities would not receive equal treatment with secular entities. We do not believe the Supreme Court intended to say or imply that should be the case.

Next we address the Diocese's argument that under neutral principles courts do not defer to TEC's decisions about non-ecclesi-

astical matters such as the identity of the trustees of the Fort Worth Corporation. The Diocese argues that under the Non–Profit Corporation Act the trustees are the 2006 trustees who are named as defendants in this suit. TEC responds that the trustees are required by the corporate bylaws to be lay persons in "good standing," the Diocese rules require them to be loyal Episcopalians, and the bylaws provide that trustees do not serve once they become disqualified. Those determinations, TEC argues, were made by Bishops Gulick and Ohls and the 2009 convention, and courts must defer to those determinations because they are ecclesiastical decisions.

While we agree that determination of who is or can be a member in good standing of TEC or a diocese is an ecclesiastical decision, the decisions by Bishops Gulick and Ohls and the 2009 convention do not necessarily determine whether the earlier actions of the corporate trustees were invalid under Texas law. The corporation was incorporated pursuant to Texas corporation law and that law dictates how the corporation can be operated, including determining the terms of office of corporate directors, the circumstances under which articles and bylaws can be amended, and the effect of the amendments. *See* TEX. BUS. ORG.CODE §§ 22.001–.409. We conclude that this record fails to show that, as a matter of law, the trustees had been disqualified from serving as corporate trustees at the relevant times. Nor does the record conclusively show whether the 2009 appointments to the corporation board by Bishop Ohl were valid or invalid under Texas law, or whether, under Texas law, the actions taken by the trustees ap-

---

6. Deeds filed after the trial court granted summary judgment were dated both before and after the 1984 judgment transferring properties from the Dallas Diocese. The deeds dated after the judgment reflect various

grantees. Some properties were deeded to the Fort Worth Corporation or local entities, while others were deeded in trust to the Corporation, local entities, or various other persons and entities.

pointed by Bishop Ohl in 2009 were valid or invalid.

Third, the Diocese argues that TEC has no trust interest in the property. TEC Canon I.7.4, also known as the Dennis Canon, provides:

> All real and personal property held by or for the benefit of any Parish, Mission or Congregation is held in trust for this Church and the Diocese thereof in which such Parish, Mission or Congregation is located. The existence of this trust, however, shall in no way limit the power and authority of the Parish, Mission or Congregation otherwise existing over such property so long as the particular Parish, Mission or Congregation remains a part of, and subject this Church and its Constitution and Canons.

The Diocese asserts that this canon does not create a trust under Texas law, but that even if it does, it was revocable and the Diocese revoked it when the Diocesan canons were amended to state:

> Property held by the Corporation for the use of a Parish, Mission or Diocesan School belongs beneficially to such Parish, Mission or Diocesan School only. No adverse claim to such beneficial interest by the Corporation, by the Diocese, or by The Episcopal Church of the United States of America is acknowledged, but rather is expressly denied.

TEC counters that the Dennis Canon creates a trust because the corporation acceded to it and the Diocese could not have adopted a canon revoking the trust. TEC also asserts that the statutes applicable to charitable trusts apply, but if they do not, a resulting trust or other trust may be applied here because the history, organization, and governing documents of the Church, the Diocese, and the parish support implication of a trust. The Diocese responds to TEC's arguments by referencing Texas statutory law requiring a trust to be in writing and providing that trusts

are revocable unless they are expressly made irrevocable. *See* TEX. PROP.CODE §§ 112.004, .051. These issues were not addressed by the trial court because it granted summary judgment based on deference principles. Upon remand the parties will have the opportunity to develop the record as necessary and present these arguments for the trial court to consider in determining the rights of the parties according to neutral principles of law. But regarding the trial court's consideration of the issue, we note that in *Masterson* we addressed the Dennis Canon and Texas law. There we said that even assuming a trust was created as to parish property by the Dennis Canon and the bylaws and actions of a parish non-profit corporation holding title to the property, the Dennis Canon "simply does not contain language making the trust *expressly* irrevocable ... Even if the Canon could be read to imply the trust was irrevocable, that is not good enough under Texas law. [Texas Property Code § 112.051] requires *express* terms making it irrevocable." *Masterson*, 422 S.W.3d at 413.

Finally, as to the argument that application of neutral principles may pose constitutional questions if they are retroactively applied, we note that over a century ago in *Brown v. Clark*, 102 Tex. 323, 116 S.W. 360 (1909), our analysis and holding substantively reflected the neutral principles methodology.

## V. Conclusion

We reverse the judgment of the trial court and remand the case to that court for further proceedings consistent with this opinion.

Justice WILLETT filed a dissenting opinion, in which Justice LEHRMANN, Justice BOYD, and Justice DEVINE joined.

Justice WILLETT, joined by Justice LEHRMANN, Justice BOYD and Justice DEVINE, dissenting.

Until 1940, when Texans amended their constitution, the Supreme Court of Texas lacked any authority to decide direct appeals (i.e., appeals that leapfrog the court of appeals and pass directly to this Court). Four years later, the Legislature first exercised its new power to permit direct appeals, and in the sixty-nine years since, this Court has exercised that jurisdiction sparingly, only forty-three times. The reason is simply stated: Our direct-appeal jurisdiction is exceedingly narrow and only proper if the trial court granted or denied an injunction "on the ground of the constitutionality of a statute of this state." [1]

Today's direct appeal is directly unappealable. The trial court's order nowhere mentions any constitution or statute, much less the constitutionality of a statute. Indeed, the trial court stated verbally that it was not pivoting on the constitutionality of state law. This dispute undoubtedly has a First Amendment overlay, but for a direct appeal, constitutionality must exist not just in the ether, but in the order.

As the trial court did not determine "the constitutionality of a statute of this state," its injunction could hardly be issued "on the ground of the constitutionality of a statute of this state." Accordingly, we lack jurisdiction. As I have underscored before (albeit, like today, in a dissent):

Ultimately, it falls to us, the courts, to police our own jurisdiction. It is a responsibility rooted in renunciation, a refusal to exert power over disputes not properly before us. Rare is a government official who disclaims power, but liberties are often secured best by studied inaction rather than hurried action.[2]

The merits in this case are unquestionably important—and thankfully they are resolved today in a companion case [3]—but here the Court can only reach them by overreaching. We have no jurisdiction to decide this case as a direct appeal. I would dismiss for want of jurisdiction, and because the Court does otherwise, I respectfully dissent.

## I. Background

The trial court in this case issued two injunctions, requiring the defendants (now styling themselves as the Episcopal Diocese of Fort Worth):

1. "to surrender all Diocesan property, as well as control of the Diocesan Corporation" to the Episcopal Church and other plaintiffs; and

2. "to desist from holding themselves out as leaders of the Diocese."

The court's reasons for granting the injunctions are laid out in paragraphs one through three of its order:

1. The Episcopal Church (the "Church") is a hierarchical church as a matter of law, and since its formation in 1983 the Episcopal Diocese of Fort Worth (the "Diocese") has been a constituent part of the Church. Because the Church is hierarchical, the Court follows Texas precedent governing hierarchical church property disputes, which holds that in the event of a dispute among its members, a constituent part of a hierarchical church consists of those individuals remaining loyal to the hierarchical church body. Under the

---

1. Tex. Gov't Code § 22.001(c).

2. *In re Allcat Claims Serv., L.P.*, 356 S.W.3d 455, 474 (Tex.2011) (Willett, J., concurring in part and dissenting in part).

3. *Masterson v. Diocese of N.W. Tex.*, 422 S.W.3d 594, 2013 WL 4608632 (Tex.2013).

law articulated by Texas courts, those are the individuals who remain entitled to the use and control of the church property.

2. As a further result of the principles set out by the Supreme Court in *Brown* and applied in Texas to hierarchical church property disputes since 1909, the Court also declares that, because The Episcopal Church is hierarchical, all property held by or for the Diocese may be used only for the mission of the Church, subject to the Church's Constitution and canons.

3. Applying those same cases and their recognition that a local faction of a hierarchical church may not avoid the local church's obligations to the larger church by amending corporate documents or otherwise invoking nonprofit corporations law, the Court further declares that the changes made by the Defendants to the articles and bylaws of the Diocesan Corporation are *ultra vires* and void.

(citations omitted).

There are no findings of fact or conclusions of law attached. The order does not mention the United States Constitution, the Texas Constitution, or any particular state statute. The only possible allusion to a statute is to "nonprofit corporations law," which the trial court found the defendants could not "invok[e]" to "avoid [their] obligations to the larger church." The trial court's legal support for this conclusion was a string citation to a number of cases, not a citation to any constitutional provision.

---

**4.** 116 S.W. 360 (Tex.1909).

**5.** 80 U.S. 679, 13 Wall. 679, 20 L.Ed. 666 (1871).

**6.** *Hosanna–Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.,* —— U.S. ——, 132

---

What is more, the defendants asked the trial court to amend the order to specify that the court had held a statute unconstitutional. The court declined to do so, orally stating that its ruling was based not on constitutionality, but rather on its application of *Brown v. Clark* [4]:

I still can't just craft something to make it go to the Supreme Court. I mean, it—my understanding was that the—the trust laws that you were talking about don't apply in this situation because of *Brown,* not because they're not constitutional.

Our decision in *Brown* relied heavily on *Watson v. Jones.*[5] *Watson,* in turn, "appl[ied] not the Constitution but a 'broad and sound view of the relations of church and state under our system of laws.'"[6]

Nonetheless, the defendants filed a direct appeal. We noted probable jurisdiction and heard oral argument. But jurisdictional defects do not heal with age, no matter how novel, pressing, or consequential the issues at stake or how many judicial and party resources have been expended. The most fundamental restraint on judicial power is jurisdiction—our very authority to decide cases in the first place—and if we lack it, we lack it.

## II. Discussion

### A. History of Direct Appellate Jurisdiction

A 1940 constitutional amendment gave the Legislature power to grant direct appeals to this Court.[7] Not until 1944, though, did the Legislature do so.[8] The original conferral allowed direct appeals from injunctions based on two grounds,

---

S.Ct. 694, 704, 181 L.Ed.2d 650 (2012) (quoting *Watson,* 80 U.S. at 727).

**7.** *See R.R. Comm'n of Tex. v. Shell Oil Co.,* 146 Tex. 286, 206 S.W.2d 235, 238 (1947).

**8.** *Id.*

either (1) the constitutionality or unconstitutionality of a state statute, or (2) the validity or invalidity of certain state administrative orders.[9] Today, the statutory grant of direct-appeal jurisdiction covers just one situation: "[A]n order of a trial court granting or denying an interlocutory or permanent injunction on the ground of the constitutionality of a statute of this state." [10]

I have found only forty-three cases where we have exercised direct-appeal jurisdiction. That is, while such jurisdiction has existed for nearly seventy years, we have exercised it stintingly. In twenty-four of the forty-three cases, our opinion made clear that the trial court either made a direct holding about a statute's constitutionality or issued declaratory relief that a statute was or was not constitutional.[11] In eleven other cases, the trial court's order clearly must have been based on constitutional grounds, either because the opinion implies that only constitutional issues were raised to the trial court [12] or because the trial court granted an injunction enforcing a statute over constitutional objection, thus implicitly upholding the statute against

9. *Id.*

10. Tex. Gov't Code § 22.001(c). The Constitution still allows the Legislature to provide for direct appeal from injunctions based on the validity of administrative orders, however. Tex. Const. art. V, § 3–b. But the express constitutional grant of direct-appeal jurisdiction in Article 5, Section 3–b of the Constitution is arguably now unnecessary given the broadened wording of the general jurisdictional provision in Article 5, Section 3. *See Perry v. Del Rio*, 67 S.W.3d 85, 98 n. 4 (Tex. 2001) (Phillips, C.J., dissenting) ("Since 1981, the Court's appellate jurisdiction has extended to all civil cases 'as ... provided ... by law,' Tex. Const. art. V, § 3, so that the Legislature could now provide for direct appeals without a specific constitutional grant of authority."). Accordingly, the Legislature has now provided for direct appeal from certain trial court rulings that involve Public Utility Commission financing orders. Tex. Util.Code § 39.303(f).

11. *See Neeley v. West Orange–Cove Consol. Indep. Sch. Dist.*, 176 S.W.3d 746, 753–54 (Tex. 2005); *State v. Hodges*, 92 S.W.3d 489, 493 (Tex.2002); *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex.2000); *Owens Corning v. Carter*, 997 S.W.2d 560, 567–68 (Tex.1999); *Maple Run at Austin Mun. Util. Dist. v. Monaghan*, 931 S.W.2d 941, 945 (Tex. 1996); *Barshop v. Medina Cnty. Underground Water Conservation Dist.*, 925 S.W.2d 618, 623, 625 (Tex.1996); *Edgewood Indep. Sch. Dist. v. Meno*, 917 S.W.2d 717, 727 (Tex. 1995); *Richards v. League of United Latin Am. Citizens*, 868 S.W.2d 306, 308 (Tex.1993); *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 442 (Tex.1993); *Orange Cnty. v.*

*Ware*, 819 S.W.2d 472, 473 (Tex.1991); *O'Quinn v. State Bar of Tex.*, 763 S.W.2d 397, 398 (Tex.1988); *LeCroy v. Hanlon*, 713 S.W.2d 335, 336 (Tex.1986); *Wilson v. Galveston Cnty. Cent. Appraisal Dist.*, 713 S.W.2d 98, 99 (Tex.1986); *Spring Branch Indep. Sch. Dist. v. Stamos*, 695 S.W.2d 556, 558 (Tex. 1985); *Shaw v. Phillips Crane & Rigging of San Antonio, Inc.*, 636 S.W.2d 186, 187 (Tex. 1982); *Gibson Distrib. Co. v. Downtown Dev. Ass'n of El Paso, Inc.*, 572 S.W.2d 334, 334 (Tex.1978); *Tex. Antiquities Comm. v. Dallas Cnty. Cmty. Coll. Dist.*, 554 S.W.2d 924, 925–27 (Tex.1977) (plurality opinion); *Smith v. Craddick*, 471 S.W.2d 375, 375–76 (Tex.1971); *State v. Scott*, 460 S.W.2d 103, 105 (Tex. 1970); *State v. Spartan's Indus., Inc.*, 447 S.W.2d 407, 409 (Tex.1969); *Jordan v. State Bd. of Ins.*, 160 Tex. 506, 334 S.W.2d 278, 278–80 (1960); *Smith v. Decker*, 158 Tex. 416, 312 S.W.2d 632, 633 (1958); *Rodriguez v. Gonzales*, 148 Tex. 537, 227 S.W.2d 791, 792–93 (1950); *Dodgen v. Depuglio*, 146 Tex. 538, 209 S.W.2d 588, 591–92 (1948).

12. *See Conlen Grain & Mercantile, Inc. v. Tex. Grain Sorghum Producers Bd.*, 519 S.W.2d 620, 621–22 (Tex.1975); *Robinson v. Hill*, 507 S.W.2d 521, 523 (Tex.1974); *Itz v. Penick*, 493 S.W.2d 506, 508 (Tex.1973); *Smith v. Davis*, 426 S.W.2d 827, 829 (Tex.1968); *Shepherd v. San Jacinto Junior Coll. Dist.*, 363 S.W.2d 742, 742–43 (Tex.1962); *King v. Carlton Indep. School Dist.*, 156 Tex. 365, 295 S.W.2d 408, 409 (1956); *Dallas Cnty. Water Control & Improvement Dist. No. 3 v. City of Dallas*, 149 Tex. 362, 233 S.W.2d 291, 292 (1950).

constitutional attack.[13] In two other cases, we summarily stated that the trial court granted or denied the injunction on the ground of a statute's constitutionality.[14] But in at least six direct-appeal cases, we did not make it clear why we thought the trial court's injunction was based on constitutional grounds.[15] These cases address jurisdiction rather cursorily, and only one of the opinions garnered a dissent on the jurisdictional issue,[16] to which the majority opinion declined to respond.[17]

But in the vast majority of cases where we have exercised direct-appeal jurisdiction, it has been abundantly clear that the trial court issued or denied an injunction on the ground of a statute's constitutionality.

We have also issued at least eleven opinions in which we *dismissed* attempted direct appeals for want of jurisdiction be-

cause the statutory test was not met.[18] We have variously explained that our direct-appeal jurisdiction "is a limited one,"[19] that we have been "strict in applying" or have "strictly applied" direct-appeal jurisdictional requirements,[20] and that "[w]e have strictly construed our direct appeal jurisdiction."[21] Therefore, we have held that to meet the jurisdictional prerequisites, a trial court must actually "pass upon the constitutionality of [a] statute,"[22] "determin[e]" a statute's constitutionality,[23] or "base its decision" on constitutional grounds.[24] Indeed, "[i]t is not enough that a question of the constitutionality of a statute may have been raised in order for our direct appeal jurisdiction to attach in injunction cases; in addition the trial court must have made a holding on the question based *on the grounds* of the constitutionality or unconstitutionality of the statute."[25]

**13.** *See Gibson Prods. Co. v. State,* 545 S.W.2d 128, 129 (Tex.1976); *Dancetown, U.S.A., Inc. v. State,* 439 S.W.2d 333, 334 (Tex.1969); *Schlichting v. Tex. State Bd. of Med. Exam'rs,* 158 Tex. 279, 310 S.W.2d 557, 558–59 (1958); *H. Rouw Co. v. Tex. Citrus Comm'n,* 151 Tex. 182, 247 S.W.2d 231, 231–32 (1952).

**14.** *See State v. Project Principle, Inc.,* 724 S.W.2d 387, 389 (Tex.1987); *Duncan v. Gabler,* 147 Tex. 229, 215 S.W.2d 155, 156–57 (1948).

**15.** *See Del Rio,* 67 S.W.3d 85 (majority opinion); *Tex. Boll Weevil Eradication Found., Inc. v. Lewellen,* 952 S.W.2d 454 (Tex.1997); *Carrollton–Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist.,* 826 S.W.2d 489 (Tex.1992); *Ass'n of Tex. Prof'l Educators v. Kirby,* 788 S.W.2d 827 (Tex.1990); *Parker v. Nobles,* 496 S.W.2d 921 (Tex.1973); *Dobard v. State,* 149 Tex. 332, 233 S.W.2d 435 (1950).

**16.** *Del Rio,* 67 S.W.3d at 98–100 (Phillips, C.J., dissenting).

**17.** *Id.* at 89, 95 (majority opinion).

**18.** *See Tex. Workers' Comp. Comm'n v. Garcia,* 817 S.W.2d 60 (Tex.1991); *Querner Truck Lines, Inc. v. State,* 652 S.W.2d 367, 368 (Tex. 1983); *Mitchell v. Purolator Sec., Inc.,* 515

S.W.2d 101 (Tex.1974); *Holmes v. Steger,* 161 Tex. 242, 339 S.W.2d 663 (1960); *Standard Sec. Serv. Corp. v. King,* 161 Tex. 448, 341 S.W.2d 423 (1960); *Gardner v. R.R. Comm'n of Tex.,* 160 Tex. 467, 333 S.W.2d 585 (1960); *Bryson v. High Plains Underground Water Conservation Dist. No. 1,* 156 Tex. 405, 297 S.W.2d 117 (1956); *Corona v. Garrison,* 154 Tex. 124, 274 S.W.2d 541 (1955); *Lipscomb v. Flaherty,* 153 Tex. 151, 264 S.W.2d 691 (1954); *Boston v. Garrison,* 152 Tex. 253, 256 S.W.2d 67 (1953); *McGraw v. Teichman,* 147 Tex. 142, 214 S.W.2d 282 (1948).

**19.** *Gardner,* 333 S.W.2d at 588.

**20.** *Querner Truck,* 652 S.W.2d at 368; *Mitchell,* 515 S.W.2d at 103.

**21.** *Garcia,* 817 S.W.2d at 61.

**22.** *Corona,* 274 S.W.2d at 541–42.

**23.** *King,* 341 S.W.2d at 425; *Bryson,* 297 S.W.2d at 119.

**24.** *Holmes,* 339 S.W.2d at 663–64.

**25.** *Mitchell,* 515 S.W.2d at 103 (emphasis in original).

A close examination of the eleven cases where we dismissed for want of jurisdiction reveals strict adherence to the Legislature's restricted framework. For example, we held "no jurisdiction" where the trial court made the injunction decision based on res judicata [26] or where the trial court was directed to do so by a writ of prohibition by the court of civil appeals.[27] That is, because the trial court did not decide the merits of the constitutional issue, we lacked direct-appeal jurisdiction.[28] Similarly, we held that we did not have such jurisdiction where the trial court denied an injunction because the plaintiffs lacked "the necessary justiciable interest" to sue.[29] We even held that we lacked jurisdiction over a direct appeal of a temporary injunction involving a "serious question" of the constitutionality of a statute, because the real purpose of the temporary injunction was merely to preserve the status quo, and the trial court did not make any holdings finally determining the constitutional issue.[30]

## B. Application

Given our long, consistent history of cautiously and narrowly construing our direct-appeal jurisdiction, the outcome of this case seems essentially predetermined: We lack jurisdiction. The Legislature allows parties to skip the court of appeals in one extraordinarily limited circumstance: where the trial court's injunction turned "on the ground of the constitutionality of a [state] statute." [31] The crux and rationale of the trial court's order is dispositive. Here, the trial court did not "pass upon the constitutionality of a statute" [32] "determin[e]" a statute's constitutionality,[33] or "base its decision" on constitutional grounds.[34] While the constitutional issues may have been *raised* in the trial court, that alone is "not enough." [35]

At most, the trial court's order only vaguely alludes to nonprofit-related statutes, and there is certainly no indication in the order that the trial court was making a constitutional determination. The trial court order refers generally to nonprofit law and says the defendants cannot rely on this law to escape the deference principle, providing a string citation as support. But only one of the cases in the string citation even refers to constitutional principles, and that case does not hold that only the deference approach is constitutional.[36] Moreover, that case was decided two years before the United States Supreme Court clarified in *Jones v. Wolf* that the "deference" rule is not mandated by the First Amendment.[37]

A diaphanous hint that a statute was viewed through a constitutional prism is not enough to justify exercising our "limited" [38] and "strictly construed" [39] direct-ap-

26. *Lipscomb*, 264 S.W.2d at 691–92.

27. *Gardner*, 333 S.W.2d at 589.

28. *Corona*, 274 S.W.2d at 541–42.

29. *Holmes*, 339 S.W.2d at 664.

30. *Mitchell*, 515 S.W.2d at 103–04.

31. Tex. Gov't Code § 22.001(c).

32. *Corona*, 274 S.W.2d at 541–42.

33. *King*, 341 S.W.2d at 425; *Bryson*, 297 S.W.2d at 119.

34. *Holmes*, 339 S.W.2d at 663–64.

35. *Mitchell*, 515 S.W.2d at 103.

36. See *Presbytery of the Covenant v. First Presbyterian Church of Paris, Inc.*, 552 S.W.2d 865, 870–71 (Tex.Civ.App.-Texarkana 1977, no writ).

37. 443 U.S. 595, 605, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979).

38. *Gardner*, 333 S.W.2d at 588.

39. *Garcia*, 817 S.W.2d at 61.

peal jurisdiction. And here, the trial judge orally eschewed such a ruling, making it doubly clear that its order was not based on constitutional grounds. In light of *Jones* (that the deference approach is *not* constitutionally required) and the trial court's comments (that it was holding the statutes inapplicable but not unconstitutional), it seems an impressive stretch to transform the trial court's citation to an ambiguous pre-*Jones* case into a constitutional holding striking down state law.

Perhaps the order's silence and the judge's disavowal are beside the point if unconstitutionality was the inescapable basis for the trial court's ruling, as the majority concludes. Indeed, the defendants contend the order makes no sense unless it turned on a constitutional holding. As the defendants interpret the order, the trial court effectively held certain statutes unconstitutional if applied to local churches of hierarchical religions. In their Statement of Jurisdiction, the defendants argue that a court can only reject statutes like this on "constitutional grounds." This assertion rests on the faulty premise that any time a court deems a statute inapplicable, it's because the statute would be unconstitutional if applied. Not true.

A court can refuse to apply a statute for various non-constitutional reasons. For example, if a statute purports to change long-standing common law, a court closely examines whether the Legislature truly intended to supplant the settled rule.[40]

The trial court in this case may have applied (or misapplied) this kind of analysis, finding that pertinent statutes did not indicate legislative intent to abandon the common-law deference principle that we declared in *Brown*. Perhaps the trial court looked at a century of legislative inaction after *Brown* and took it as legislative acquiescence. There are other non-constitutional reasons to deem a statute ineffective, like the absurdity doctrine.[41] So even if a trial court implicitly invalidates a statute or finds it inapplicable, its reason for doing so is not necessarily because the Constitution demands it.

Thus, it cannot be true that by following *Brown v. Clark*, the trial court implicitly held that any statute that might apply under neutral principles is necessarily unconstitutional if applied to a church-property dispute in a hierarchical setting. This argument is foreclosed by *Jones v. Wolf.* If states are free, consistent with the First Amendment, to choose either approach, then choosing the deference test cannot equate to an implicit holding that applying statutes relevant under neutral principles would be unconstitutional. Nobody can argue that Texas courts are *required* to adopt neutral principles—*Jones* precludes that argument.

Tellingly, the defendants do not attempt to analogize this case to any other in which the Court has exercised direct-appeal jurisdiction. None is comparable. No constitutional question was presented (or decided) in the trial court, and none is presented (or decided) here.[42]

---

**40.** *See Energy Serv. Co. of Bowie v. Superior Snubbing Servs., Inc.,* 236 S.W.3d 190, 194 (Tex.2007) ("Of course, statutes can modify common law rules, but before we construe one to do so, we must look carefully to be sure that was what the Legislature intended.").

**41.** *See, e.g., TGS–NOPEC Geophysical Co. v. Combs,* 340 S.W.3d 432, 439 (Tex.2011).

**42.** The Rules of Civil Procedure previously specified that we could not accept such juris-

diction unless the case presented a constitutional question to *this* Court. *Lipscomb,* 264 S.W.2d at 691–92, quotes the former rule (Tex.R. Civ. P. 499a(b)) as providing (emphasis added):

An appeal to the Supreme Court directly from such a trial court may present only the constitutionality or unconstitutionality of a statute of this State, or the validity or invalidity of an administrative order issued by a state board or commission under a statute of this State, *when the same shall have*

Undoubtedly, we have already noted probable jurisdiction, heard argument on the merits, and committed substantial judicial resources to resolving the issues—to say nothing of the effort and cost expended by the parties. But to assert jurisdiction simply because it would be inconvenient to do otherwise betrays the deeply rooted constitutional principle that our jurisdiction is conferred ultimately from the People, directly through our Constitution and indirectly through our elected representatives.

Dismissing this case for want of jurisdiction would be sure to furrow brows, but there is no more principled reason to dismiss a case than to decide, even belatedly, that you lack the power to decide. Besides, and this is some consolation, the core merits issue presented—deciding which legal test should govern church-property disputes—is squarely resolved in today's companion case,[43] so a dismissal here would not unduly delay authoritative resolution or work any irreparable harm.

### III. Conclusion

Our characterizations of direct-appeal jurisdiction, something we have "strictly construed," are not ambiguous:

- "rare"
- "restricted"
- "very limited"

In light of this consistent clarity, the Court's exercise of jurisdiction has an unfortunate *ipse dixit* quality to it. The

statutory test for direct-appeal jurisdiction is whether the trial court made its decision "on the ground of the constitutionality of a [state] statute." A statute, for example, must be invalidated, not just implicated. Direct-appeal jurisdiction is a rare (as it should be) short-circuiting of the usual rules, and I respectfully take exception to broadening the exception.

The power of judicial review—the authority to declare laws unconstitutional—is a genuinely stunning one, and one that judges exercise with surpassing trepidation. Given the stakes, it is difficult to imagine a judge striking down a legislative enactment stealthily, using gauzy language that requires reading between the lines. This judge certainly didn't believe he had declared anything unconstitutional, and he said as much—on the record and unequivocally.

Today marks the second time this Court has stretched our direct-appeal jurisdiction beyond its statutory bounds.[44] The objective in both cases has apparently been to let the Court fast-forward to the merits of an important case. But an issue's importance and our commendable desire to resolve it swiftly does not give us license to enlarge our jurisdictional powers by fiat. In language that could have been written with today's case in mind, Chief Justice Phillips wrote in dissent over a decade ago:

> Dismissing a case on jurisdictional grounds may be frustrating to judges

---

*arisen by reason of the order of a trial court granting or denying an interlocutory or permanent injunction.*

Accordingly, we said that one of the prerequisites for direct-appeal jurisdiction was that a constitutional "question is presented to this Court for decision." *Bryson,* 297 S.W.2d at 119. Admittedly, our Rules (which have since migrated to the Rules of Appellate Procedure) no longer specify that a direct appeal must present an actual constitutional question to

this Court. TEX. R. APP. P. 57; *see also Del Rio,* 67 S.W.3d at 98–99 (Phillips, C.J., dissenting). But the Legislature's limited grant of such jurisdiction has not wavered, and we simply cannot accept a direct appeal unless a statute has been declared constitutional or unconstitutional. That did not happen here.

**43.** *Masterson,* 422 S.W.3d 594.

**44.** *See Del Rio,* 67 S.W.3d at 89 (majority opinion).

and litigants alike, particularly when issues of statewide import are involved.... However, the Legislature has chosen to make direct appeal an uncommon remedy, available only in rare and specific situations. Regardless of the day's exigencies, our highest and only duty is to respect the appropriate limits of our power.... I fear that our Court has allowed a hard case to make bad law today.[45]

The Court may come to rue its decision to assert direct-appeal jurisdiction in this case. Our rules seem to *mandate* our exercise of such jurisdiction in cases where a *permanent* injunction is based on the constitutionality of a statute (because our rules make direct-appeal jurisdiction discretionary only in *temporary* injunction cases).[46] Therefore, in addition to encroaching on the Legislature's constitutional prerogative to define our direct-appeal jurisdiction, the Court's decision may perversely *require* this Court to immediately hear all direct appeals of permanent injunctions that even vaguely implicate a statute's constitutionality.

I would dismiss this case for want of jurisdiction, and because the Court does otherwise, I respectfully dissent.

---

**45.** *Id.* at 100 (Phillips, C.J., dissenting).

