FILED
18-0438
5/22/2020 2:57 PM
tex-43191915
SUPREME COURT OF TEXAS
BLAKE A. HAWTHORNE, CLERK

# IN THE SUPREME COURT OF TEXAS

══════════════

No. 18-0438

══════════════

THE EPISCOPAL DIOCESE OF FORT WORTH, ET AL., PETITIONERS,

v.

THE EPISCOPAL CHURCH, ET AL., RESPONDENTS

══════════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE SECOND DISTRICT OF TEXAS

══════════════════════════════════════════

**Argued December 5, 2019**

JUSTICE GUZMAN delivered the opinion of the Court.

JUSTICE BLAND did not participate in the decision.

Following a disagreement over religious doctrine, the Episcopal Diocese of Fort Worth and

a majority of its congregations withdrew from The Episcopal Church. The church replaced the

diocese's leaders with church loyalists, and both the disaffiliating and replacement factions claimed

ownership of property held in trust for the diocese and local congregations. As all parties agree, a

corporate entity holds legal title to the disputed property for the benefit of the Episcopal Diocese of

Fort Worth and congregations in union with that diocese's convention.[1] The central issue on appeal

─────────────────────

[1] Most of the disputed property is held in trust for a particular congregation, but some property, including administrative and recreational buildings, is held in trust for the diocese.

is narrow: which faction of the splintered Episcopal diocese is the "Episcopal Diocese of Fort Worth"? The withdrawing faction contends that under the diocese's organizational documents, the unincorporated association's identity is determined by the majority. The church and the loyalists contend the entity's identity is an ecclesiastical determination the First Amendment requires courts to accept and, under secular law, a subordinate entity in a tiered association cannot unilaterally withdraw from the association even under organizational documents providing for majority rule.

When this property dispute first came to the Court on direct appeal seven years ago, we held that what happens to property following a religious entity's disassociation from a hierarchical church is a nonecclesiastical issue to be determined based on the same neutral principles of law applicable to other entities unless the entity's affairs "have been ordered so that ecclesiastical decisions effectively determine the property issue."[2] Applying neutral principles to the undisputed facts, we hold that (1) resolution of this property dispute does not require consideration of an ecclesiastical question,[3] (2) under the governing documents, the withdrawing faction is the Episcopal Diocese of Fort Worth, and (3) the trial court properly granted summary judgment in the withdrawing faction's favor. We therefore reverse the court of appeals' contrary judgment.

---

[2] *Episcopal Diocese of Fort Worth v. Episcopal Church*, 422 S.W.3d 646, 650 (Tex. 2013); *Masterson v. Diocese of Nw. Tex.*, 422 S.W.3d 594, 607 (Tex. 2013).

[3] *See Jones v. Wolf*, 443 U.S. 595, 604 (1979) ("[T]here may be cases where the deed, the corporate charter, or the constitution of the general church incorporates religious concepts in the provisions relating to the ownership of property.").

2

## I. Background

The Episcopal Church (TEC) in the United States is a three-tiered religious organization founded in 1789. The first and highest tier of the organization is the General Convention, which consists of representatives from each regional diocese and most TEC bishops.[4] The second tier is composed of geographically defined regional dioceses, each of which is governed by its own constitution and canons but must also accede to the General Convention's constitutions and canons.[5] Each diocese elects a bishop (Diocesan Bishop) who is subject to TEC's ecclesiastical regulation, and each diocese is governed by a legislative body called a convention (Diocesan Convention). The Diocesan Bishop, clergy, and lay representatives from each congregation in the diocese comprise the convention. The third tier is composed of local parishes, missions, and congregations, which in turn adopt the constitution and canons of their regional diocese and the General Convention.

In 1982, the Episcopal Diocese of Fort Worth (Fort Worth Diocese) was formed as an unincorporated association after the Episcopal Diocese of Dallas voted to divide. Since its inception, the Fort Worth Diocese's constitution has provided that church property "acquired for the use of a particular Parish or Mission" shall be held by the Corporation of the Episcopal Diocese of Fort Worth (the Diocesan Corporation) "in trust for the use and benefit of such Parish or Mission" that

---

[4] A "convention" is a legislative body of the church, and the "General Convention" is the national legislative body of the Episcopal Church. *An Episcopal Dictionary of the Church*, https://episcopalchurch.org/library/glossary/general-convention.

[5] "Canons are the written rules that provide a code of laws for the governance of the church." *Id.*

is in union with the diocese's convention (the Diocesan Trust).[6] The constitution further provides that if a parish or mission dissolves, the property held in trust by the Diocesan Corporation "shall revert to said Corporation for the use and benefit of the Diocese, as such." Since its inception, amendments to the diocese's constitution and canons have been authorized based on a majority vote of the Diocesan Convention.[7] Under the governing documents, election of the Diocesan Bishop and members of the diocese's standing committee require either a concurrent majority vote of diocesan clergy and laity attending the convention or a super-majority vote, depending on the circumstances.

The Fort Worth Diocese's canons require the Diocesan Corporation's affairs to be conducted and administered by a Board of Trustees of five elected members, all of whom must be either (1) lay persons "in good standing of a parish or mission in the Diocese," or (2) "members of the Clergy canonically resident in the Diocese." The Diocesan Bishop serves as Chairman of the Board unless the bishop designates another officer of the corporation to serve as such. The canons empower the

---

[6] Article 14 (formerly Article 13) of the Fort Worth Diocese's constitution states:

The title to all real estate acquired for the use of the Church in this Diocese, including the real property of all Parishes and Missions, as well as Diocesan Institutions, shall be held subject to control of the Church in The Episcopal Diocese of Fort Worth acting by and through a corporation known as "Corporation of the Episcopal Diocese of Fort Worth." All such property as well as all property hereafter acquired for the use of the Church and the Diocese, including Parishes and Missions, shall be vested in Corporation of the Episcopal Diocese of Fort Worth.

Corporation for the Episcopal Diocese of Fort Worth shall hold real property acquired for the use of a particular Parish or Mission in trust for the use and benefit of such Parish or Mission. . . . Such property may not be conveyed, leased or encumbered by Corporation of the Episcopal Diocese of Fort Worth without the consent of the Rector, Wardens and Vestry of such Parish or Mission. Upon dissolution of such Parish or Mission, property held in trust for it shall revert to said Corporation for the use and benefit of the Diocese, as such.

All other property belonging to the Diocese, as such, shall be held in the name of the Corporation . . . .

[7] Article 2 of the Diocesan Constitution defines "convention" as the diocese's legislative body.

4

Board of Trustees to conduct the corporation's affairs "in accordance with its charter and by-laws and in accordance with the Constitution and Canons of the Diocese from time-to-time adopted."

In 1982, after the Fort Worth Diocese adopted its constitution and canons (Diocesan Constitution and Canons), it was admitted into union with TEC. At that time, the new diocese and every congregation in its jurisdiction "fully subscribe[d] to and accede[d] to the Constitution and Canons of The Episcopal Church." The "Dennis Canon," which purports to impose a trust on all church property for TEC's benefit, has been among TEC's governing principles since 1979. In contrast to the Diocesan Trust, it provides:

> All real and personal property held by or for the benefit of any Parish, Mission or Congregation is held in trust for this Church and the Diocese thereof in which such Parish, Mission or Congregation is located. The existence of this trust, however, shall in no way limit the power and authority of the Parish, Mission or Congregation otherwise existing over such property so long as the particular Parish, Mission or Congregation remains a part of, and subject to, this Church and its Constitution and Canons.

In 1983, the Fort Worth Diocese filed articles incorporating the Diocesan Corporation as a Texas nonprofit of perpetual duration. Consistent with the Diocesan Constitution and Canons, the articles of incorporation required the corporation to administer trust property "in accordance with the Constitution and Canons of the Episcopal Diocese of Fort Worth as they now exist or as they may hereafter be amended." At that time, the corporate bylaws also provided that "the affairs of this nonprofit corporation shall be conducted in conformity with the Constitution and Canons of the Episcopal Church in the United States of America and the Constitution and Canons of the Episcopal Diocese of Fort Worth, as they may be amended or supplemented from time to time." Bylaws consistent with the Diocesan Constitution and Canons established the number of trustees, the terms

5

of office, and the procedure for electing trustees and filling vacancies.[8] Amendments to the bylaws were authorized on a majority vote of trustees attending any regular or special board meeting. The year after incorporation, friendly litigation between the Fort Worth and Dallas dioceses resulted in a judgment vesting legal title of certain real and personal property in the Diocesan Corporation.

Five years later, in 1989, the Fort Worth Diocese repudiated any trust imposed by the Dennis Canon by amending its canons to expressly disclaim the existence of a trust for TEC's benefit:

> Property held by the Corporation for the use of a Parish, Mission or Diocesan School belongs beneficially to such Parish, Mission or Diocesan School only. No adverse claim to such beneficial interest by the Corporation, by the Diocese, or by The Episcopal Church of the United States of America is acknowledged, but rather is expressly denied.

Nearly two decades later, unresolved doctrinal differences culminated in a schism that precipitated this dispute. In 2006, the Diocesan Corporation unanimously amended its articles and bylaws to remove all references to TEC. The amendments also gave the trustees authority to determine the Diocesan Bishop's identity for purposes of the governing documents, if identity is disputed; allowed a majority of trustees to select the Chairman of the Board when the diocese is without a bishop; and authorized removal of a trustee by a majority of the board rather than by the bishop. The amendments did not alter the terms of office or change the process for electing trustees or filling vacancies, but as of 2006, the bylaws required the corporation's trustees to be "lay persons in good standing of a parish or mission in the body now known as the Episcopal Diocese of Fort

---

[8] *See* TEX. BUS. ORGS. CODE § 22.207.

Worth, or members of the clergy canonically resident within the geographical region of the body now known as the Episcopal Diocese of Fort Worth."

Believing TEC had embraced doctrine reflecting "a substantial departure from the biblical and historic faith," the 2007 and 2008 conventions of the Fort Worth Diocese also voted overwhelmingly to withdraw from union with TEC. To that end, the conventions amended the Diocesan Constitution and Canons to remove references to TEC and to reflect membership with the Anglican Province of the Southern Cone.[9] Under the continued leadership of Bishop Jack Iker, and operating as the "Episcopal Diocese of Fort Worth," the withdrawing faction — which constituted the vast majority of the diocese — retained control of property acquired for the use and benefit of the diocese and its congregations.[10]

Ecclesiastical and legal ramifications ensued from these actions. In December 2008, TEC accepted Bishop Iker's renunciation and removed him from all positions of authority within the church. TEC and clergy for the remaining congregants (collectively TEC) took the position that (1) the majority had no power to unilaterally withdraw a diocese from the hierarchical church, (2) those voting to do so contemporaneously vacated their official positions and immediately lost their status as communicants in good standing, and (3) any changes to the diocese's and corporation's organizational documents were void ab initio. In light of these determinations, TEC

---

[9] For example, prior to 2008, the preamble to the Diocesan Constitution and Canons referred to the Fort Worth Diocese as "the Clergy and Laity of the Episcopal Church resident in that portion of the State of Texas constituting what is known as The Episcopal Diocese of Fort Worth," but on a majority vote, the preamble was amended to describe the diocese as "the Clergy and Laity of the Episcopal Diocese of Fort Worth."

[10] Three congregations loyal to TEC left the Fort Worth Diocese, taking their property with them.

convened a special convention of the loyal faction to fill the offices "vacated" by those who had voted to disaffiliate from the national church. The special convention voted to reverse the constitutional amendments adopted at the 2007 and 2008 Diocesan Conventions; declared all offices of the diocese and the corporation's Board of Trustees vacant; and elected new "qualified" leaders for both the diocese and the corporation. Replacement of diocesan and corporate leaders admittedly did not comport with the requirements of the organizational documents, but TEC viewed the circumstances as an unforeseen emergency necessitated by improper actions of the former leadership. After recognizing the remaining Episcopal congregations and new leadership as the continuing "Episcopal Diocese of Fort Worth," TEC sued the opposing diocese and its leaders, the opposing corporate leaders, and departing congregations (collectively the Majority Diocese) to recover church property and endowment funds both factions claimed to control under the Diocesan Trust. TEC also laid claim to the property under the Dennis Canon. The heart of the dispute is the identity of the Fort Worth Diocese.

On cross-motions for summary judgment, a central issue was whether the property dispute should be resolved using the "deference" methodology or "neutral principles of law." "A court applying the deference approach defers to and enforces the decision of the highest authority of the ecclesiastical body to which the matter has been carried."[11] "Under the neutral principles methodology, ownership of disputed property is determined by applying generally applicable law and legal principles [and] will usually include considering evidence such as deeds to the properties,

---

[11] *Masterson v. Diocese of Nw. Tex.*, 422 S.W.3d 594, 602 (Tex. 2013).

terms of the local church charter (including articles of incorporation and [bylaws], if any), and relevant provisions of governing documents of the general church."[12]  Applying the deference methodology, the trial court granted summary judgment in TEC's favor.

On direct appeal, we reversed, holding Texas courts must use neutral principles of law to determine "which faction is entitled to a religious organization's property following a split or schism[.]"[13]  Though both the deference and neutral principles methodologies are constitutionally permissible, we adhere to the latter as the exclusive methodology "because it better conforms to Texas courts' constitutional duty to decide disputes within their jurisdiction while still respecting limitations the First Amendment places on that jurisdiction."[14]  In a companion case issued the same day, we explained that "courts are to apply neutral principles of law to issues such as land titles, trusts, and corporate formation, governance, and dissolution, even when religious entities are involved."[15]  We remanded the case to the trial court to allow the parties to develop a record under the appropriate methodology.[16]

To provide guidance on remand, we also addressed certain arguments the parties had made regarding application of the neutral-principles methodology.  Among other things, we held that "who is or can be a member in good standing of TEC or a diocese is an ecclesiastical decision," but the

---

[12] *Id.* at 603.

[13] *Episcopal Diocese of Fort Worth v. Episcopal Church*, 422 S.W.3d 646, 647 (Tex. 2013).

[14] *Masterson*, 422 S.W.3d at 596.

[15] *Id.* at 606.

[16] *Episcopal Diocese*, 422 S.W.3d at 651-52.

9

determinations TEC, the replacement bishops, and the 2009 special convention made as to those matters "[did] not necessarily determine whether *the earlier actions* of the corporate trustees were invalid under Texas law."[17] Rather, Texas corporations law "dictates how the corporation can be operated, including determining the terms of office of corporate directors, the circumstances under which articles and bylaws can be amended, and the effect of the amendments," and the summary judgment record did not conclusively establish that "the trustees had been disqualified from serving as corporate trustees at the relevant times."[18] Regarding the existence of a canonical trust, we held that "even assuming a trust was created as to parish property by the Dennis Canon," trusts are revocable under Texas law unless they are expressly made irrevocable and "the Dennis Canon 'simply does not contain language making the trust *expressly* irrevocable[.]'"[19] Finally, we rejected TEC's retroactive application complaint because the neutral principles methodology was substantively applied more than a century ago in *Brown v. Clark*.[20]

On remand, the parties once again filed cross-motions for summary judgment with the opposite result ensuing from the application of neutral principles. The trial court (1) granted final judgment in the Majority Diocese's favor as to the disputed real property and endowment funds; (2) declared that since 2005, the trustees of the Diocesan Corporation were the duly elected representatives from the Majority Diocese, including Bishop Iker as Chairman of the Board; and

---

[17] *Id.* at 652 (emphasis added).

[18] *Id.* (citing TEX. BUS. ORGS. CODE §§ 22.001–.409).

[19] *Id.* at 653 (quoting *Masterson*, 422 S.W.3d at 613, and citing TEX. PROP. CODE §§ 112.004, .051).

[20] *Id.* (citing *Brown v. Clark*, 116 S.W. 360 (Tex. 1909)).

(3) permanently enjoined TEC's clergy and leaders from acting as "The Episcopal Diocese of Fort Worth."

The court of appeals reversed and rendered in part, reversed and remanded in part, and affirmed in part without a majority opinion.[21] A lone opinion, joined only by its author, provides an exhaustive account of the record and a dissertation on the neutral principles methodology. For convenience, we refer to that opinion as the court of appeals' opinion.

The court held that (1) the Diocesan Trust is invalid, so real property ownership must be determined based on property-deed language; (2) the Dennis Canon trust is not enforceable under Texas law because "a proposed beneficiary [like TEC] cannot unilaterally name itself as the beneficiary of a trust involving another entity's property"; (3) the First Amendment requires deference to TEC's identification of the diocese affiliated with TEC because the organizational result of a schism is an ecclesiastical matter; (4) TEC lacks standing to claim control of the Diocesan Corporation; (5) the corporation's governing documents were amenable to amendment but the language used in the 2006 bylaws "the body now known as" the Fort Worth Diocese refers to the diocese affiliated with TEC because in 2006, the Fort Worth diocese was affiliated with TEC; (6) after 2008, the TEC-affiliated faction is the only one entitled to appoint the corporation's board; and (7) a constructive trust and other equitable relief is not available because "[whether] Bishop Iker and the rest are the perfidious oath-breakers characterized by the TEC parties is . . . inextricably intertwined with First Amendment implications." The court rendered judgment for TEC in part

---

[21] 547 S.W.3d 353 (Tex. App.—Fort Worth 2018). One panel member retired while the case was pending and the other concurred in the judgment without issuing an opinion.

using 2 of 121 deeds as exemplars and remanded to the trial court to resolve the property dispute as to the remaining properties and disputed endowment funds.

We granted the Majority Diocese's petition for review and TEC's conditional cross petition.

## II. Discussion

Congregants, local churches, and leaders of religious entities are free to disassociate from a hierarchical church at any time. The critical question is who keeps the property. With ten years of litigation behind them, all parties to this dispute now agree that:

- the Diocesan Trust is valid and enforceable according to its terms;

- the Diocesan Corporation holds *legal* title to the disputed property;

- *equitable* title is settled by the Diocesan Trust's terms;

- the trust beneficiaries are the local parishes and missions in union with the Convention of the Fort Worth Diocese;

- which parishes and missions are in union with each faction and which congregants are in good standing with each faction are ecclesiastical issues, but neither party challenges the good-standing of opposing members in the opposing parishes or the union of opposing congregations with the opposing diocese; and

- the only issue with regard to the Diocesan Trust is which faction constitutes the continuation of the Fort Worth Diocese.

In resolving this dispute, both sides acknowledge that *Episcopal Diocese of Fort Worth v. Episcopal Church*[22] and *Masterson v. Diocese of Northwest Texas*[23] require application of neutral principles of law, but they disagree about how those principles apply to this case.

_____

[22] 422 S.W.3d at 646-47.

[23] 422 S.W.3d at 596.

12

The Majority Diocese asserts that the Diocesan Constitution and Canons affirm its identity as the Fort Worth Diocese because all actions taken to disassociate conformed with its provisions and were not in conflict with the terms of the General Covention's constitution and canons. TEC takes the position that, even under neutral principles, Texas courts must defer to a hierarchical church's superior authority to determine which faction constitutes the true diocese. In TEC's view, the identity of the Fort Worth Diocese is a church membership issue, not a property issue, because the church does not recognize the power of a subordinate unit to secede. Accordingly, TEC contends the property dispute is settled in its favor as an "incidental effect" of the hierarchical church's ecclesiastical determinations regarding the Fort Worth Diocese's qualified representatives. TEC further contends that under Texas unincorporated associations law, a subordinate entity of a tiered organization cannot be unilaterally withdrawn even on the vote of a majority.

In addition, and in the alternative, TEC claims beneficial title under the terms of the Dennis Canon, which it maintains is a valid trust that either could not be revoked by the 1989 amendment to the Diocesan Constitution and Canons or is irrevocable as a contractual trust. And if TEC does not prevail under either of the express trusts, it seeks control of the disputed church property under constructive-trust and quasi-estoppel theories. Finally, TEC challenges the ruling of the lower courts that it lacks standing to pursue its claims as to the Diocesan Corporation.

## A. Neutral Principles of Law

Church property disputes predate our nation's founding, but the passage of time has not made resolving such matters any less complicated. States have "an obvious and legitimate interest in the peaceful resolution of property disputes, and in providing a civil forum where the ownership of

13

church property can be determined conclusively."[24]  Even so, the First Amendment of the United

States Constitution "severely circumscribes the role that civil courts may play in resolving church

property disputes."[25]  "Most importantly, the First Amendment prohibits civil courts from resolving

church property disputes on the basis of religious doctrine and practice."[26]  But the "conflicting

pressures"[27] exerted by the First Amendment's free exercise and establishment clauses require courts

to walk a fine, and often indistinct, line in adjudicating ownership of church property when

hierarchical entities disassociate.[28]

Church property disputes involving hierarchical church organizations, like TEC, are

challenging because their organizational structure requires subordinate units to accede to

ecclesiastical control by higher authorities.  Historically, three different approaches have been

employed to resolve those disputes: the departure-from-doctrine principle, which requires courts to

award property to whichever faction of the church adheres to "the true standard of faith";[29] the

deference approach, which requires courts to defer to and enforce the decision of the highest

---

[24] *Jones v. Wolf*, 443 U.S. 595, 602 & n.1 (1979).

[25] *Id.* (quoting *Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969)).

[26] *Id*.

[27] *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005).

[28] *See Masterson*, 422 S.W.3d at 606; *see also Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 734 (1976) (Rehnquist, J., dissenting) (cautioning that blind deference to church determinations may avoid a free exercise problem but create "far more serious" Establishment Clause problems).

[29] *Watson v. Jones*, 80 U.S. 679, 727-29 (1871); *see Jones*, 443 U.S. at 599 & n.1.

authority of the ecclesiastical body to which the matter has been carried;[30] and the neutral principles of law method, which allows courts to settle church property disputes by examining   in a purely secular manner   the language of deeds, local church charters, state statutes, and provisions of a general church's constitution.[31]   The United States Supreme Court has rejected the departure-from-doctrine method (also known as the "English approach") as contrary to the First Amendment.[32]  But both the deference and neutral principles methodologies are constitutionally permissible.[33]  "Indeed, 'a State may adopt *any* one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters . . . or the tenets of faith.'"[34]  A majority of states, including Texas, apply the neutral principles approach.[35]

The United States Supreme Court's leading neutral principles case is *Jones v. Wolf*, which involved a property dispute after a local church split from a hierarchal church organization.[36]  There,

---

[30] *Jones*, 443 U.S. at 603-05; *see Watson*, 80 U.S. at 727-29 ("[W]henever the question of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them.").

[31] *Jones*, 443 U.S. at 602-03; *see Watson*, 80 U.S. at 727-29 ("Religious organizations come before us in the same attitude as other voluntary associations . . . and their rights are equally under the protection of the law . . . [according to decisive principles] applicable alike to all of its class[.]").

[32] *Jones*, 443 U.S. at 599 & n.1 (1979); *Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 443 & n.2, 449-50 (1969); *Watson*, 80 U.S. at 727-29; *see* U.S. CONST., amend. I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]").

[33] *Jones*, 443 U.S. at 602-04; *Watson*, 80 U.S. at 727-29.

[34] *Jones*, 443 U.S. at 602 (quoting *Md. & Va. Churches v. Sharpsburg Church*, 396 U.S. 368, 500 (1970) (Brennan, J., concurring) (emphasis in original)).

[35] *Masterson v. Diocese of Nw. Tex.*, 422 S.W.3d 594, 606-07 & n.6 (Tex. 2013).

[36] 443 U.S. at 597.

15

like here, the local church's actions were subject to ecclesiastical review and regulation by the higher church.[37] But the Supreme Court approved the state court's use of the neutral principles methodology to determine ownership of the property.[38] *Jones* identifies several advantages of the neutral principles approach, including that it (1) "promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice"; (2) is "flexible enough to accommodate all forms of religious organization and polity"; and (3) encourages churches to avail themselves of "appropriate reversionary clauses and trust provisions" to control what happens to church property if a dispute arises, such as by identifying "what religious body will determine ownership in the event of a schism or doctrinal controversy."[39] The Court explained that neutral principles of law rely exclusively on objective, well-established concepts of trust and property law that are familiar to judges and lawyers and produce outcomes reflecting the parties' intentions before the dispute erupted.[40]

But the neutral principles approach is not without limitations. When ecclesiastical questions are at issue, "deference is compulsory because courts lack jurisdiction to decide ecclesiastical questions."[41] So while neutral principles of law are applied to issues "such as land titles, trusts, and

---

[37] *Id.* at 598.

[38] *Id.* at 603.

[39] *Id*.

[40] *Id.* at 603, 606.

[41] *Masterson*, 422 S.W.3d at 602.

16

corporate formation, governance, and dissolution, even when religious entities are involved,"[42] if an instrument "incorporates religious concepts" so that "interpretation of the instruments of ownership would require the civil court to resolve a religious controversy," the court must defer to the authoritative ecclesiastical body's resolution of that issue.[43] And in some instances, "deferring to decisions of ecclesiastical bodies in matters reserved to them by the First Amendment may . . . effectively determine the property rights in question."[44]

Such was the case in *Serbian Eastern Orthodox Diocese v. Milivojevich* in which a defrocked bishop asked the civil court to declare him the "true Diocesan Bishop" of an undivided diocese.[45] When the Mother Church in Russia removed Bishop Milivojevich from his post as head of the diocese and reorganized the diocese by dividing it into three parts, Milivojevich sued in Illinois state court to reverse the church's disciplinary and organizational determinations on the basis that the church's tribunal exceeded the scope of its authority under church law and therefore acted arbitrarily.[46] The state court ruled in Milivojevich's favor, holding the Mother Church violated its own procedures and internal regulations and lacked authority to divide the diocese.

---

[42] *Id.* at 606.

[43] *Jones*, 443 U.S. at 604; *see Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 709 (1976) (the dispute "essentially involve[d] not a church property dispute, but a religious dispute the resolution of which . . . is for ecclesiastical and not civil tribunals").

[44] *See Milivojevich*, 426 U.S. at 709.

[45] *Id.* at 707.

[46] *Id.*

On appeal, the Supreme Court reversed, observing the state court's judgment "rest[ed] upon an impermissible rejection of the decisions of the highest ecclesiastical tribunals" and impermissibly substituted its own inquiry into church polity. The Court explained:

> For civil courts to analyze whether the ecclesiastical actions of a church judicatory are in that sense "arbitrary" must inherently entail inquiry into the procedures that canon or ecclesiastical law supposedly requires the church judicatory to follow, or else into the substantive criteria by which they are supposedly to decide the ecclesiastical question. But this is exactly the inquiry that the First Amendment prohibits; recognition of such an exception would undermine the general rule that religious controversies are not the proper subject of civil court inquiry, and that a civil court must accept the ecclesiastical decisions of church tribunals as it finds them.[47]

The "basic dispute" in *Milivojevich* was control of the Eastern Orthodox Diocese for the United States of America and Canada, its property, and assets.[48] But control of church property was merely an "incidental effect" of deciding who ran the church itself because church charters vested control in the denominational leader, which only the Mother Church had authority to select.[49] As the Court explained, "this case essentially involves not a church property dispute, but a religious dispute the resolution of which under our cases is for ecclesiastical and not civil tribunals."[50]

Consistent with *Milivojevich*, we have observed that "[c]ourts applying the neutral principles methodology defer to religious entities' decisions on ecclesiastical and church polity issues such as

---

[47] *Id.* at 713.

[48] *Id.* at 698.

[49] *Id.* at 699, 701, 709-10.

[50] *Id.* at 709.

18

who may be members of the entities and whether to remove a bishop or pastor."[51]  That is, what happens to the *relationship* between a hierarchical religious organization and a subordinate unit after a vote to disassociate "is an ecclesiastical matter over which civil courts generally do not have jurisdiction."[52]  "But what happens to the property **is not**, *unless the [local entity's] affairs have been ordered so that ecclesiastical decisions effectively determine the property issue.*"[53]

The Majority Diocese acknowledges TEC's ecclesiastical authority but contends property ownership is a temporal matter determined by what the diocese's charters, state statutes, and TEC's constitution and canons actually say about the Fort Worth Diocese's governance.  TEC contends ecclesiastical matters determine what happens to the property at issue here because (1) the dispute is essentially a question of church leadership, which is indisputably an ecclesiastical question, and (2) the parties ordered the Fort Worth Diocese's affairs so that ecclesiastical decisions effectively determine the property issue.  At bottom, the disagreement centers on what effect the majority's disassociation vote had on the Fort Worth Diocese's identity   specifically, whether the majority faction constitutes the continuation of that entity or whether the majority left as individuals and became something else.

### B. Diocesan Identity for Purposes of the Diocesan Trust

The Fort Worth Diocese is an unincorporated association formed and operating in Texas. Accordingly, issues concerning its officers and control are governed by the Texas Uniform

---

[51] *Episcopal Diocese of Fort Worth v. Episcopal Church*, 422 S.W.3d 646, 650 (Tex. 2013).

[52] *Masterson v. Diocese of Nw. Tex.*, 422 S.W.3d 594, 607 (Tex. 2013).

[53] *Id.* (emphases added).

19

Unincorporated Nonprofit Association Act.[54] Under Texas Associations law, control and governance are determined by the terms of the Fort Worth Diocese's charters.[55]

TEC argues, however, that we cannot rely on these documents to determine who controls the Fort Worth Diocese and whether the actions taken at the 2007 and 2008 conventions were valid. Rather, TEC argues that, like *Milivojevich*, the property dispute in this case is incidentally settled by deference to TEC's determination as to who its denominational representatives are. No one disputes that TEC's determinations as to its denominational leaders and "good standing" with the church are ecclesiastical questions. But unlike *Milivojevich*, the Fort Worth Diocese's affairs were not arranged so that ecclesiastical decisions "effectively determine the property issue."[56] *Milivojevich* is

---

[54] *See* TEX. BUS. ORGS. CODE § 1.103 (for entities formed in Texas without filing instruments with the state, "the law governing the entity's formation and internal affairs is the law of the entity's jurisdiction of formation"); *see also* TEX. REV. CIV. STAT. art. 1396–70.01 (expired January 1, 2010); TEX. BUS. ORGS. CODE § 402.006 ("[P]rior law governs the acts, contracts, or transactions of the entity or its managerial officials, owners, or members that occur before the mandatory application date" of January 1, 2010); *Dist. Grand Lodge No. 25 v. Jones*, 160 S.W.2d 915, 922 (Tex. 1942) ("It is generally held that the constitution and by-laws of a voluntary association, whether incorporated or not, are controlling as to its internal management.").

[55] *See* TEX. BUS. ORGS. CODE §§ 1.002(35)(A) ("'Governing authority' means a person or group of persons who are entitled to manage and direct the affairs of an entity under this code and the governing documents of the entity . . . ."), .002(36)(A)(ii) ("'Governing documents' means . . . the other documents or agreements adopted by the entity under this code to govern the formation or the internal affairs of the entity."), .002(53)(D) (defining a "member" of a nonprofit association as "a person who has membership rights in the nonprofit association under its governing documents"), .002(63) (an "officer" is "an individual elected, appointed, or designated as an officer of an entity by the entity's governing authority or under the entity's governing documents"); 3.002 ("The requirements for the formation of and the determination of the existence of a nonfiling entity are governed by the title of this code that applies to that entity."), .101 ("Subject to the title of this code that governs the domestic entity and the governing documents of the domestic entity, the governing authority of a domestic entity manages and directs the business and affairs of the domestic entity."); 252.106 ("This chapter replaces existing law with respect to matters covered by this chapter but does not affect other law covering unincorporated nonprofit associations."); *see id.* § 252.002 ("Principles of law and equity supplement this chapter unless displaced by a particular provision of this chapter.").

[56] *Masterson*, 422 S.W.3d at 606-07.

distinguishable from this case because there, unlike here, control of church property was placed in the hands of a denominational leader.

Here, the parties arranged the diocese's affairs so that a majority of the diocese and its convention control the unincorporated association. The Fort Worth Diocese's charters provide that (1) a majority vote of its convention can amend the Diocesan Constitution and Canons and convention rules; (2) a majority vote of the convention elects the Diocesan Bishop, officers of the diocese's standing committee, and trustees of the Diocesan Corporation; and (3) a majority vote of the convention can admit, suspend, or restore a parish or mission to union with the Convention. Notably, in *Jones v. Wolf*, the Supreme Court held that the First Amendment does not preclude a state from adopting a *presumptive* rule of majority rule.[57] This is so because "the majority faction generally can be identified without resolving any question of religious doctrine or polity."[58] Moreover, "any rule of majority representation can always be overcome, under the neutral-principles approach, either by providing in the corporate charter or the constitution of the general church, that the identity of the local church is to be established in some other way . . . [such as] by providing that the church property is held in trust for the general church and those who remain loyal to it."[59]

Rather than advocating for a *presumption* of majority rule to determine that it remains the Fort Worth Diocese, the majority faction simply asks the court to enforce the majority-rule

---

[57] *Jones v. Wolf*, 443 U.S. 595, 607 (1979).

[58] *Id.*

[59] *Id.* at 607-08.

provisions in the organizational documents.[60]  If courts can *presume* majority rule without

encroaching on constitutionally protected terrain, courts can certainly apply that rule when the parties

have so provided.  Accordingly, having complied with the diocese's charters, the majority, not the

minority, constitutes the continuation of the Fort Worth Diocese under the terms of its charter.

TEC's contrary argument that deference is required, rather than majority rule, is virtually

indistinguishable from the approach the dissent in *Masterson* advocated.[61]  As in *Masterson*, TEC

contends the First Amendment mandates deference because, as a matter of church law, subordinate

units have no authority to disassociate.  Accordingly, in TEC's view, the actions of the 2007 and

2008 Diocesan Conventions were *instantaneously* null and void; those voting to disassociate

*immediately* vacated their offices and lost standing in canonical bodies; and these are binding

ecclesiastical decisions regardless of what the Fort Worth Diocese's governing documents say.

Consequently, TEC takes the position that, even if the majority voted to secede, they did so as

individuals and not as an intact entity constituting the Fort Worth Diocese.

TEC points out that when the Fort Worth Diocese joined the hierarchical church organization

it acceded to the General Convention's constitution and canons.  But in 2007 and 2008, a majority

of the Diocesan Convention voted to amend its governing documents to change all provisions

---

[60] *See Masterson*, 422 S.W.3d at 613 (holding that amendments to a corporation's organizational documents were valid absent "any provision in the corporate documents" permitting TEC to invalidate those amendments or any "Texas law precluding the corporation from amending its articles and bylaws to exclude references" to TEC).

[61] *See id.* at 618 (Lehrmann, J., dissenting) ("It follows that Bishop Ohl's determination regarding the parish's authority (or, more accurately, lack of authority) to withdraw from TEC is a binding ecclesiastical decision, irrespective of the corporate form taken by the parish.  In turn, since Good Shepherd did not validly withdraw from TEC, Good Shepherd remained a constituent thereof and consequently remained subject to TEC's and the Diocese's Constitutions and Canons.").

referring to TEC and requiring compliance with its canons and constitution. No provision in any of the organizational documents, including those of the national church, precluded them from doing so. TEC's charters are silent about withdrawal of a diocese. Moreover, whether a diocese can secede from TEC does not affect the parties' property rights, because the Diocesan Trust has never required affiliation with TEC. Nor do the organizational documents restrict the diocese's authority to amend the Diocesan Constitution and Canons, such as by requiring the national church's approval or permission to make an amendment.[62]

As we stated in *Masterson*, "[a]bsent specific, lawful provisions in a corporation's articles of incorporation or bylaws otherwise, whether and how a corporation's directors or those entitled to control its affairs can change its articles of incorporation are secular, not ecclesiastical, matters."[63] Rejecting the very same argument TEC advances here, we explained:

> Bishop Ohl [the Diocesan Bishop] could, as an ecclesiastical matter, determine which faction of believers was recognized by and was the 'true' church loyal to the Diocese and TEC. Courts must defer to such ecclesiastical decisions. But under neutral principles, any decisions he made about the secular legal questions of whether the vote by the parish members to amend the bylaws and articles of incorporation was valid under Texas law and whether the bylaws and articles of incorporation were validly amended, *are not entitled to deference*. Nor does his decision identifying the loyal faction as the continuing Episcopal Parish operating Good Shepherd church determine property ownership under this record, as it might under the deference or identity methodology.[64]

---

[62] *See Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 700-01 (1976) (the diocesan constitution expressly required the Mother Church's approval for amendments to the constitution).

[63] *See Masterson*, 422 S.W.3d at 609.

[64] *Id.* at 610 (emphasis added).

23

And more pointedly, we said the dissent's argument that the "corporation could not amend its articles of incorporation and bylaws to omit references to TEC and the Diocese because doing so would circumvent 'an ecclesiastical decision made by a higher authority within a hierarchical church structure,' is *in substance application of the deference methodology*."[65]

The issue here is essentially the same as it was in *Masterson*  was the majority vote to amend the governing documents effective?  And the same answer obtains:  any decisions TEC made about the secular legal questions of whether the vote by the 2007 and 2008 Diocesan Conventions to amend the Diocesan Constitutions and Canons was valid under Texas law and whether they were validly amended are not entitled to deference.[66]

In sum, TEC's determinations as to which faction is the true diocese loyal to the church and which congregants are in good standing are ecclesiastical determinations to which the courts must defer.  But applying neutral principles to the organizational documents, the question of property ownership is not entwined with or settled by those determinations.  The Fort Worth Diocese's identity depends on what its documents say.  To that end, the Diocesan Constitution and Canons provided who could make amendments and under what circumstances; none of those circumstances incorporate or rely on an ecclesiastical determination by the national church; and nothing in the

---

[65] *Id.* at 612-13 (emphasis added).

[66] In arguing that a subordinate unit of a hierarchical organization *cannot* be governed by majority rule under Texas law, TEC relies on cases involving lodges and masons, which hold special status under the law.  *See* TEX. BUS. ORGS. CODE §§ 23.104(c) ("A subordinate body is subject to the jurisdiction and control of its respective grand body, and the warrant or charter of the subordinate body may be revoked by the grand body."), .110 ("On the winding up and termination of a subordinate body attached to a grand body, all property and rights existing in the subordinate body pass to and vest in the grand body to which it was attached, subject to the payment of any debt owed by the subordinate body.").  While there is authority that such entities cannot disaffiliate even under majority rule, no similar provision governs unincorporated associations generally.

24

diocese's or national church's documents precluded amendments rescinding an accession to or affiliation with TEC. Applying neutral principles of law, we hold that the majority faction is the Fort Worth Diocese and parishes and missions in union with that faction hold equitable title to the disputed property under the Diocesan Trust. We must therefore consider TEC's argument that the Dennis Canon creates a trust in its favor.

### C. Dennis Canon Trust

The Dennis Canon provides, in relevant part, that "all real and personal property held by or for the benefit of any Parish, Mission or Congregation is held in trust for [TEC][.]" The parties dispute the trust's validity under Texas law and its revocability.

Under Texas trust law, a trust may be created by any of the following methods:

(1) a property owner's declaration that the owner holds the property as trustee for another person;

(2) a property owner's inter vivos transfer of the property to another person as trustee for the transferor or a third person;

(3) a property owner's testamentary transfer to another person as trustee for a third person;

(4) an appointment under a power of appointment to another person as trustee for the donee of the power or for a third person; or

(5) a promise to another person whose rights under the promise are to be held in trust for a third person.[67]

---

[67] TEX. PROP. CODE § 112.001.

A trust is created only if the settlor manifests, in writing, an intention to create a trust,[68] and a settlor may revoke a trust "unless it is irrevocable by the express terms of the instrument creating it or of an instrument modifying it."[69]

The court of appeals held that the Dennis Canon is not a valid trust under Texas law because "an entity that does not own the property to be held in trust cannot establish a trust for itself simply by decreeing that it is the beneficiary of a trust."[70] As to revocability, we held in *Masterson* and *Episcopal Diocese* that even assuming the Dennis Canon is a valid trust, it is revocable under Texas law because it was not made expressly irrevocable.[71] Moreover, "[e]ven if the Canon could be read to *imply* the trust was irrevocable, that is not good enough under Texas law. The Texas statute requires *express* terms making [the trust] irrevocable."[72]

For the reasons stated by the court of appeals (among others), the Majority Diocese asserts the Dennis Canon is not a valid trust, but even if it were valid, it was revocable and revoked by the 1989 amendment to the Diocesan Constitution and Canons, nearly two decades before this dispute arose.

TEC contends the Dennis Canon creates a valid trust and argues it is entitled to possession of the disputed property under that trust for two independent reasons: (1) the 1989 amendment was

---

[68] *Id.* §§ 112.002–.004.

[69] *Id.* § 112.051.

[70] 547 S.W.3d 353, 424 (Tex. App.—Ft. Worth 2018).

[71] *Episcopal Diocese of Fort Worth v. Episcopal Church*, 422 S.W.3d 646, 653 (Tex. 2013); *Masterson v. Diocese of Nw. Tex.*, 422 S.W.3d 594, 613 (Tex. 2013).

[72] *Masterson*, 422 S.W.3d at 613 (emphases in original).

26

ineffective to revoke the Dennis Canon trust because, at that time, the Diocesan Constitution and Canons only authorized amendments to the diocese's canons that were "not inconsistent" with the national church's constitution and canons and (2) the trust is irrevocable because it is a contractual trust supported by valuable consideration. Neither argument is persuasive.

While it is true, as TEC says, that the diocese's organizational documents prohibited the adoption of canons inconsistent with the national church's constitution and canons, revocation is not inconsistent with a revocable trust. Moreover, in the twenty years between revocation and eruption of a dispute over the property,[73] TEC lodged no objection to the amended canon and does not now contend the 1989 amendment is invalid for any other reason than purported "inconsistency."

In the alternative, and contrary to our holdings in *Masterson* and *Episcopal Diocese*, TEC insists that the Dennis Canon is irrevocable notwithstanding the absence of express language of irrevocability, as required by Texas Property Code section 112.051. TEC cites *Shellberg v. Shellberg* for the proposition that a contractual trust supported by valuable consideration is irrevocable even when silent about the matter.[74] TEC contends that membership in the national church is "valuable consideration" and that courts are precluded from considering whether the benefits of membership (including $63,000 in grants, low-interest loans, and participation in the Church Pension Fund) constitute a fair trade for $100 million worth of real estate for which TEC paid nothing.

---

[73] *See Jones v. Wolf*, 443 U.S. 595, 606 (1979) (the objective under neutral principles is to determine "the intentions of the parties" at the local and national level regarding beneficial ownership of the property "before the dispute erupts" and as reflected in a "legally cognizable form").

[74] 459 S.W.2d 465, 470 (Tex. App.—Fort Worth 1970, writ ref'd n.r.e.).

*Shellberg*, however, is patently distinguishable. In *Shellberg*, five settlors signed a trust agreement stating the trust could be revoked by three or more of them.[75] Although each settlor provided valuable consideration for the trust, one of the settlors attempted to revoke the trust, noting the absence of express language of irrevocability as required by statute.[76] The attempted revocation did not comply with the trust's express and bargained-for terms and was therefore ineffective: "A proper construction of the trust instruments involved in this case is that *by their terms* such trust can only be terminated short of the trust term by the agreement or consent of a majority of the beneficiaries."[77] *Shellberg* is consistent with the statutory rule that the terms of a trust generally prevail over conflicting statutory provisions.[78] TEC has not identified any provision constraining revocation of the Dennis Canon, so the statutory requirement of express language retains its legal force.

### D. TEC's Remaining Claims

By cross-petition, TEC seeks control of the disputed property via constructive-trust, quasi estoppel, and trespass-to-try-title theories and contends the lower courts improperly concluded it lacks standing to press its claims as to the Diocesan Corporation.

---

[75] *Id.* at 467.

[76] *Id.* at 469-70.

[77] *Id.* at 470 (emphasis added).

[78] *See* TEX. PROP. CODE § 111.0035(b) (subject to exceptions not applicable here, "[t]he terms of a trust prevail over any provision of this subtitle").

The court of appeals declined TEC's constructive-trust claim because such relief would require the court "to delve into the mysteries of faith," impermissibly entangling the court in a dispute over religious doctrine.[79] We agree with the court's analysis. The First Amendment prohibits civil courts from inquiring into matters concerning "'theological controversy, church discipline, ecclesiastical government, or the conformity of the members of a church to the standard of morals required of them.'"[80]

The doctrinal controversy precipitating the schism involved a dispute over adherence to the true standard of faith. Reminiscent of the discredited departure-from-doctrine principle, TEC's constructive-trust argument is premised on allegations that the withdrawing faction "'broke a century's worth of oaths and commitments' when they left and took the TEC-affiliated property, resources, and name."[81] In the withdrawing faction's view, it was TEC who engaged in heretical actions constituting a "substantial departure from the biblical and historic faith." Determining whether the leaders of the withdrawing faction are "the perfidious oath-breakers characterized by the TEC parties"[82] rather than the true adherents to the historic Episcopalian faith requires the type of inquiry that runs afoul of the First Amendment's constraints. Civil courts lack jurisdiction to resolve disputes turning on tenets of faith.

---

[79] 547 S.W.3d 353, 443-44 (Tex. App.—Fort Worth 2018).

[80] *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 714 (1976) (quoting *Watson v. Jones*, 80 U.S. 679, 733 (1872)).

[81] 547 S.W.3d at 443.

[82] *Id.* at 444.

TEC's quasi estoppel and trespass-to-try title arguments fare no better. Both theories are rooted in TEC's claim that the loyal congregants comprise the continuing entities, and the quasi estoppel argument, like TEC's constructive-trust claim, asserts the withdrawing faction broke promises and oaths to use the property for Episcopalian purposes.

Finally, both the trial court and the court of appeals held TEC has no standing to pursue claims against the Diocesan Corporation's individual trustees for breach of duties to TEC. Citing *Masterson*, the court of appeals explained that the Corporation's documents do not require TEC's approval for amendments and Texas law does not preclude the trustees from making amendments to exclude references to TEC; accordingly, TEC cannot pursue claims that the Corporation's trustees breached fiduciary duties to TEC in doing so.[83] Because we agree the record does not support the existence of duties owed by the trustees to TEC, we affirm that portion of the court's judgment.

### III. Conclusion

For the reasons stated, we affirm the court of appeals' judgment in part, reverse the judgment in part, and render judgment reinstating the trial court's judgment.

_____
Eva M. Guzman
Justice

**OPINION DELIVERED:** May 22, 2020

---

[83] *Id.* at 442 (citing *Masterson*, 422 S.W.3d at 613).

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below:

Envelope ID: 43191915
Status as of 05/22/2020 23:01:27 PM -05:00

Associated Case Party: The Local Episcopal Congregations

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Frank Hill | | fhill@hillgilstrap.com | 5/22/2020 2:57:10 PM | SENT |

Associated Case Party: The Episcopal Church

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mary E.Kostel | | mkostel@episcopalchurch.org | 5/22/2020 2:57:10 PM | SENT |
| William M.Jay | | wjay@goodwinlaw.com | 5/22/2020 2:57:10 PM | ERROR |

Case Contacts

| Name |
|------|
| Robert PowerRitchie |
| Richard KentPiacenti |
| Kathleen Wells |
| R. David Weaver |
| Sandra Cockran Liser |
| Frank Gilstrap |
| Daniel Tobey |
| Frank Warren Hill |
| Jonathan D. F. Nelson |
| Thomas S. Leatherbury |
| Scott ABrister |
| Shelby Sharpe |
| Stephen S.Gilstrap |
| William D.Sims, Jr. |
| Mary E.Kostel |

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below:

Envelope ID: 43191915
Status as of 05/22/2020 23:01:27 PM -05:00

Case Contacts

| David BoothBeers | | dbeers@goodwinprocter.com | 5/22/2020 2:57:10 PM | ERROR |
|---|---|---|---|---|
| David BoothBeers | | dbeers@goodwinlaw.com | 5/22/2020 2:57:10 PM | ERROR |
| Mary E.Kostel | | mkostel@goodwinlaw.com | 5/22/2020 2:57:10 PM | ERROR |
| Scott Brister | | ScottBrister@HuntonAK.com | 5/22/2020 2:57:10 PM | SENT |